Marsha Francine MODDERNO,
Appellant,

v.

James B. KING, Director, U.S. Office
of Personnel Management
Agency, Appellee.

No. 94–5400.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 12, 1996.

Decided April 23, 1996.

Rehearing and Suggestion for Rehearing
In Banc Denied July 1, 1996.

Marsha F. Modderno, pro se, was on the briefs for appellant.

Sharon L. Volckhausen, student counsel, argued the cause on the side of appellant and filed the briefs for amicus curiae appointed by the court. With her on the briefs were Steven H. Goldblatt, Washington, DC, amicus curiae, Michelle J. Anderson, attorney, and Deanne L. Chun, student counsel.

Cynthia A. Schnedar, Assistant United States Attorney, argued the cause for appellee. With her on the briefs were Eric H. Holder, Jr., United States Attorney, R. Craig Lawrence, and Michael J. Ryan, Assistant United States Attorneys.

Douglas S. McDowell and Ann E. Reesman, Washington, DC, were on the brief for amicus curiae Equal Employment Advisory Council.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Concurring opinion filed by Circuit Judge GINSBURG.

STEPHEN F. WILLIAMS, Circuit Judge:

Marsha Francine Modderno suffers from a mental illness that required her hospitalization from 1988 to 1991. During this period she was covered by the Foreign Service Benefit Plan by virtue of her status as the former spouse of a Foreign Service officer. In 1990 the Plan imposed a number of limitations on benefits for mental health care, limits not paralleled by similar restrictions on benefits for physical illness. Of these restrictions, the parties focus on a $75,000 lifetime maximum for mental health benefits; no one argues that the other limits (such as different thresholds for catastrophic coverage) pose any distinctive issues. Modderno claims that the limitations on mental health benefits violate § 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits discrimination on the basis of disability in any program conducted by an executive agency of the United States. Because the Office of Personnel Management ("OPM") accepted the Plan in the exercise of its duty to contract for federal employees' health insurance plans, see 5 U.S.C. § 8902, the Plan is subject to § 504.

The district court dismissed Modderno's complaint on the ground that it failed to state a claim upon which relief could be granted. *Modderno v. King*, 871 F.Supp. 40 (D.D.C. 1994). Modderno appeals the dismissal, arguing first that the version of § 504 in effect at the time OPM contracted for the new limits prohibits it from imposing a limit on mental health benefits in the absence of a matching limit regarding physical illness. Alternatively, Modderno argues that a 1992 amendment of § 504, importing standards from the Americans with Disabilities Act of 1990 ("ADA") to § 504, prohibits what OPM has done.

In addition to these arguments, Modderno argues more generally that differential treatment of mental and physical illness is wrongheaded both as a matter of basic justice and from the perspective of a long-term prudential calculus. She says, for example, that "what may be perceived as providing equal benefits to all (such as providing the same mental benefits to everyone in a health care plan, for instance) is not actually providing equal benefits to all when the effect is to prevent one class from achieving equal access to fundamental rights." And she urges that "[t]he growing body of social research shows that the costs of treating the mental[ly] ill are far less than the ultimate costs of not treating them, for workers and employers alike." Whatever the merit of these broader arguments, we must leave them for resolution in other spheres, such as the political branches of government, markets, or the activities of eleemosynary institutions. Confining ourselves to Modderno's legal claims under § 504 of the Rehabilitation Act, we conclude that the district court correctly dismissed the complaint.

## I. Section 504 of the Rehabilitation Act

■ Section 504 of the Rehabilitation Act provides:

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from ... participation in, be denied the benefits of, or be subjected to discrimination under any ... program or activity conducted by any Executive agency....

29 U.S.C. § 794. The government conceded for purposes of the district court's ruling on its motion to dismiss that Modderno is "otherwise qualified" to participate in the Plan (apparently as the former spouse of a covered employee) and that she is a person with a disability. See *Modderno*, 871 F.Supp. at 42. Thus the only question under § 504 is whether the Plan's differential treatment of mental and physical illness excludes Modderno from participation in, denies her the benefits of, or subjects her to discrimination within the meaning of the statute.

Modderno's broadest argument is that the Plan violates § 504 because it provides "unequal benefits" to persons with mental ill-

ness. Although Modderno does not offer a yardstick by which to measure inequality, we may fairly assume that the restrictions cause inequality, in some sense of the word, as between those disabled by mental illness and persons disabled only by physical impairments or not disabled at all. The question, however, is whether the probable inequality is the sort of harm the Rehabilitation Act was intended to redress. The Supreme Court has held unanimously that it is not. *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The Court in *Alexander* concluded that Tennessee's generalized limitations on Medicaid payments, which fell disproportionately on disabled individuals because of their greater medical needs, were not subject to challenge under § 504 merely because of that disproportion:

> Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance. The Act does not, however, guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed.

*Id.* at 304, 105 S.Ct. at 721–22 (citation omitted).

Amicus curiae for Modderno would distinguish *Alexander* on the principle that the limits disputed here constitute a "facial discrimination" between different types of disability (mental and other), whereas *Alexander* addressed an across-the-board limit on the number of inpatient hospital days for which Tennessee's Medicaid program would grant reimbursement. Because of the supposed facial discrimination, amicus argues that the disputed limits are invalid unless "supported by actuarial data."

The first difficulty with this view is that the limits contained in the Plan do not in any way track the Rehabilitation Act's definition of disability—the only ground on which the Act forbids discrimination. The Act defines an "individual with a disability" as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B). Thus, the phrase "by reason of her or his disability" in § 504's anti-discrimination command presumably means by reason of one of the things described in (i), (ii) or (iii) of 29 U.S.C. § 706(8)(B). While the definition mentions physical and mental impairments, it appears to do so only by way of assuring that the remedies provided by the Act are comprehensive, rather than to assure any kind of equality as between sufferers of mental, as opposed to physical, disability. The statute thus focuses on disability, yet the Plan in no way uses that criterion, as would, for example, a plan that distinguished between disabling and non-disabling mental illness. Rather the Plan distinguishes between mental and physical illness—a distinction that seems no more pertinent to the concerns of the Act than would a special provision on lower back pain, so long as the provision did not distinguish between lower back pain that "substantially limit[ed] one or more of [a] person's major life activities" and lower back pain that did not have such an impact. We are of course not saying that distinctions not framed in terms of "disability" per se are ipso facto valid under the Act; *Alexander's* refusal to rule out disparate impact claims under the Act makes such a position impossible. See 469 U.S. at 292–99, 105 S.Ct. at 715–19.[1] But we are saying that a plan's mere reference to a particular impairment or class of impairments, with no use of the statutory concept of disability (or some close surrogate), is not enough to catapult it into the "facially discriminatory" category.

---

1. We note, however, that while *Alexander* assumed (without deciding) the viability of disparate impact analysis under the Rehabilitation Act, its holding—that generalized Medicaid limits did not violate § 504 notwithstanding their disproportionate effect on the disabled—would seem to rule out a successful § 504 disparate impact claim based on the terms of an insurance plan. In refusing to rule out disparate impact analysis as a general matter, the Court referred not to insurance coverage but to such matters as architectural barriers, job qualifications, and access to public transportation and educational services. *Alexander,* 469 U.S. at 297, 105 S.Ct. at 718.

Even if the coverage limits in the Plan were thought to constitute "facial discrimination" on the basis of disability, however, that would neither invalidate the Plan nor condition its validity on any kind of actuarial justification such as amicus proposes. Under *Alexander*, a covered insurance provider is clearly permitted to limit the lifetime benefits for all illness, mental and physical, to some fixed amount such as the $75,000 that OPM has adopted here for mental illness; such a limit is in principle the same as the limit on reimbursements for hospital stays in *Alexander*.[2] A provider is thus also permitted to impose similar limits on both the lifetime benefits for mental illness and, separately, for physical illness. But according to the amicus's argument, the fact that OPM has *not* imposed a lifetime benefit limit for physical illness somehow transforms the Plan from one that would not discriminate on the basis of disability (or otherwise transgress the requirements of § 504) into one that does. And this would be the result even though the disabled *as a class* —mentally and physically disabled individuals in the aggregate—are *better off* under the latter arrangement than under a plan in which mental and physical health benefits are each subject to a lifetime limit of $75,000. We simply cannot believe that a statute enacted for the benefit of the disabled produces this result. If § 504 permits across-the-board limits on coverage, as *Alexander* holds, then it cannot forbid partial limits that leave some disabled individuals better off and the remainder no worse off. Cf. *Traynor v. Turnage*, 485 U.S. 535, 549, 108 S.Ct. 1372, 1382, 99 L.Ed.2d 618 (1988) ("There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons."). Thus, while the Supreme Court in *Alexander* accorded only a "Cf." cite to *Doe v. Colautti*, 592 F.2d 704 (3d Cir.1979), which upheld

durational limits applicable only to inpatient care for psychiatric problems, see *Alexander*, 469 U.S. at 304, 105 S.Ct. at 721–22, distinctions between mental and physical care are no more vulnerable under § 504 than are completely generalized limits.[3]

The peculiarity of the amicus's argument is underscored by the absence of any claim about the correlation between mental and physical disabilities. We are given no reason to believe that the two are inversely related—that the incidence of physical disability is any less for the mentally disabled than for persons not mentally disabled. If mental disabilities are *positively* correlated with physical ones, then amicus's argument for invalidation of the selective $75,000 lifetime limit would (if successful) disproportionately harm precisely the class sought to be protected—mentally disabled individuals—vis-a-vis the valid across-the-board $75,000 limit. In any event, whatever the relationship between mental and physical disabilities, invalidation of the selective lifetime limit would make both the disabled as a class and the mentally disabled as a class worse off. Section 504 cannot require such a result.

Perhaps mentally disabled individuals are more vulnerable to discrimination than the physically disabled. If so, then Congress might wish to enact a statute affording the mentally disabled special protection. But the Rehabilitation Act is simply not such a statute.

We note, finally, that the amicus never explains just what sort of "actuarial data" might rescue from condemnation the sort of distinction drawn here, were the distinction deemed to make out some sort of prima facie violation of § 504. Would it be a comparison between the average lifetime costs of mental disability as opposed to the corresponding average for physical disability, so that the $75,000 cap for mental health benefits would survive only if average lifetime physical dis-

2. The Court in *Alexander* emphasized that the limit on reimbursements did not deny the disabled "meaningful access" to Tennessee's Medicaid program. 469 U.S. at 302, 105 S.Ct. at 720–21. A $75,000 lifetime maximum would likewise surely satisfy *Alexander*'s requirement that the disabled "benefit meaningfully from the coverage they will receive." *Id.* .

3. Distinctions among types of disability would violate the Equal Protection Clause if they lacked any rational basis, but no one claims this to be the case here.

ability costs were $75,000 or less—thereby implementing a judgment that sufferers from mental and physical disabilities are non-overlapping classes that should enjoy some sort of average equality of dollar benefits? Any such calculation would be highly sensitive to the definition of "disability." If the definition were relatively broad, the average cost would tend to be lower than under a more restrictive definition. Thus survival of a limit on mental health benefits might well depend on which type of disability—mental or physical—featured the larger proportion of less serious conditions. The computation would, moreover, do nothing to evaluate the restriction on mental health benefits by reference to the sort of criteria—such as avoidance of moral hazard and the aggregation of independent (but similar) risks—that enable insurers to maximize the availability of insurance. See George L. Priest, "The Current Insurance Crisis and Modern Tort Law," 96 *Yale L.J.* 1521, 1539–50 (1987). But we have no reason to try to sort out these collateral problems because, as discussed above, amicus's theory that distinctions in coverage must be defended by actuarial data is untenable under *Alexander.*

■ Modderno's pro se complaint contains, in addition to the primary claim based on differential treatment of mental and physical illness, an allegation of intentional discrimination against the mentally disabled on the part of OPM. While a complaint may not be dismissed unless the plaintiff can prove no set of facts that would entitle him or her to relief, the complaint must, to survive a motion to dismiss, give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The only fact alleged by Modderno in support of her claim of intentional discrimination is that during the negotiations over the 1991 Plan, which imposed the new limitations on mental health benefits, OPM urged the administrator of the plan to cut back on such benefits. We are unable to see how the fact that someone advocated a step that ended up being taken could create an inference of intentional discrimination—unless, of course, the step were itself independently discriminatory. As the limits on

mental health benefits have not been shown to be discriminatory, the "intent" allegation adds nothing. Thus Modderno's complaint fails to state a claim under § 504 of the Rehabilitation Act as it stood before its amendment in 1992.

II. 1992 Amendments to the Rehabilitation Act

■ Modderno argues that even if her complaint fails to state a claim under § 504 prior to its amendment in 1992, that amendment saves her case. The 1992 amendment incorporates into § 504 the standards of several sections of the ADA:

The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 ... and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 ..., as such sections relate to employment.

Rehabilitation Act Amendments of 1992, Pub.L. No. 102–569, § 506, 106 Stat. 4344 (codified at 29 U.S.C. § 794(d)).

OPM advances a number of arguments (none of them jurisdictional) as to why the 1992 provision is inapplicable to this case. Even assuming it does apply, however, the new language only reinforces our reading of the original § 504. We therefore bypass those objections and move directly to the merits of the claim under amended § 504.

Title I of the ADA prohibits discrimination in employment, including any use of "standards, criteria, or methods of administration ... that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(a) & (b)(3)(A). Whatever that might add to or subtract from Modderno's claim, § 501(c) of the ADA creates a qualified safe-harbor for insurance plans. It says that the provisions in title I shall not be construed to prohibit or restrict (among other things) "a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate

insurance," provided that this saving provision "shall not be used as a subterfuge to evade the purposes" of the ADA. 42 U.S.C. § 12201(c).

It is undisputed that the Plan, which is provided by an agency of the federal government, is a bona fide benefit plan not subject to state laws that regulate insurance. Thus, even if the general language of the amendment implied that the Plan would be illegal in the absence of some actuarial showing (a claim on which we need not pass), it passes muster under the § 501(c) safe-harbor so long as it doesn't run afoul of the exception for subterfuges.

The Supreme Court has twice interpreted similar "subterfuge" language in the Age Discrimination in Employment Act of 1967 ("ADEA"). See *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977); *Pub. Employees Retirement System v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989). "Subterfuge," the Court has said, is to be given "its ordinary meaning as 'a scheme, plan, stratagem, or artifice of evasion.'" *Betts*, 492 U.S. at 167, 109 S.Ct. at 2861 (quoting *McMann*, 434 U.S. at 203, 98 S.Ct. at 450). In both *McMann* and *Betts*, the Court concluded that this meaning of subterfuge implied that benefit plans adopted before the enactment of the ADEA could not be subterfuges to evade its purposes. *McMann*, 434 U.S. at 203, 98 S.Ct. at 450; *Betts*, 492 U.S. at 168, 109 S.Ct. at 2861–62. In *McMann*, for instance, where the plan at issue had been adopted in 1941, long before the enactment of the ADEA, the Court observed that "[t]o spell out an intent in 1941 to evade a statutory requirement not enacted until 1967 attributes, at the very least, a remarkable prescience to the employer." 434 U.S. at 203, 98 S.Ct. at 450. The Court refused to require an employer to demonstrate a business purpose for a plan adopted prior to the ADEA to show that the plan was not a subterfuge to evade the purposes of the Act. *Id.*

Here, the coverage limitations challenged by Modderno were adopted in 1990, before the 1992 amendment importing the ADA standards into § 504 of the Rehabilitation Act had been enacted or even proposed in

committee. See H.R.Rep. No. 822, 102nd Cong., 2nd Sess. (1992) (stating that subcommittee hearings leading to the Rehabilitation Act Amendments began in September of 1991, and that the bill was introduced on the floor in June of 1992). Furthermore, no one suggests that OPM modified the Plan because of some expectation that passage of the ADA would lead to amendment of the Rehabilitation Act. Accordingly, under *McMann* and *Betts*, the limitations in the Plan cannot constitute a subterfuge to evade congressional purposes.

It might be argued that Congress's response to the decisions in *McMann* and *Betts* undermines our reliance on their interpretation of the term "subterfuge." After *McMann* upheld a mandatory retirement plan because of its pre-ADEA origin, Congress amended the Act to make clear that such plans were not permitted regardless of whether they ran afoul of the subterfuge requirement. See Age Discrimination in Employment Act Amendments of 1978, Pub.L. No. 95–256, § 2(a), 92 Stat. 189 (codified at 29 U.S.C. § 623(f)(2) (1985), *amended by* Older Workers Benefit Protection Act of 1990, Pub.L. No. 101–433, § 103(1), 104 Stat. 978) (incorporating a proviso into the subterfuge section according to which "no ... employee benefit plan shall require or permit the involuntary retirement of any individual ... because of the age of such individual"). After *Betts*, Congress opted to remove the "subterfuge" language from the ADEA entirely. Older Workers Benefit Protection Act § 103(1) (codified at 29 U.S.C. § 623(f)(2)).

In fact the congressional responses to *McMann* and *Betts* do not undermine, and indeed may strengthen, the argument for interpreting "subterfuge" in the ADA consistently with those decisions. First, as to *McMann*, the response did not indicate a rejection of the Court's understanding of "subterfuge" generally—the subterfuge language was left undisturbed—but only of its application to pre-ADEA mandatory retirement plans. See *Betts*, 492 U.S. at 167, 109 S.Ct. at 2861 ("Congress changed the specific result of *McMann* by adding a final clause to [29 U.S.C. § 623(f)(2)], but it did not change

the controlling, general language of the statute.") The response to *Betts* presumably does reflect a decision that "subterfuge," as understood by the Court, was not a suitable way to accomplish the congressional purpose in the context of the ADEA. But *Betts* had been decided, and the response to it enacted, before Congress adopted the "subterfuge" language of § 501(c) of the ADA. Thus when Congress chose the term "subterfuge" for the insurance safe-harbor of the ADA, it was on full alert as to what the Court understood the word to mean and possessed (obviously) a full grasp of the linguistic devices available to avoid that meaning.

The Equal Opportunity Employment Commission ("EEOC"), in a document setting forth "Interim Enforcement Guidance" on the application of the ADA to disability-based distinctions in employer-provided health insurance, has offered a different interpretation of the "subterfuge" provision. "Subterfuge," according to the EEOC, refers to "disability-based disparate treatment that is not justified by the risks or costs associated with the disability." Equal Opportunity Employment Comm'n, Interim Enforcement Guidance, N–915.002 (June 8, 1993), at 11; see also *id.* at 7 (defining "disability-based distinctions" as including distinctions among different disabilities as well as distinctions between disabilities and other conditions). Thus the EEOC believes that a disability-based distinction is invalid unless the employer supports it by some sort of cost-based showing, with the details of implementation left obscure. But the Department of Labor had taken a somewhat similar position on the ADEA "subterfuge" provision at issue in *Betts,* saying that " 'a plan or plan provision which prescribes lower benefits for older employees on account of age is not a "subterfuge" within the meaning of [29 U.S.C. § 623(f)(2) ], *provided that* the lower level of benefits is justified by age-related cost considerations.' " *Betts,* 492 U.S. at 170, 109 S.Ct. at 2863 (quoting 29 CFR § 1625.10(d) (1988)) (emphasis added). The Labor Department interpretation could not prevail because, even assuming deference to the agency under *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the cost-justification requirement was

"at odds with the plain language of the statute itself." 492 U.S. at 171, 109 S.Ct. at 2863. Except for a distinction cutting even more *against* the agency interpretation here (that there may be no coherent way of performing a useful actuarial calculation for mental and physical disabilities), the cases appear identical.

Because the coverage limitations challenged by Modderno were enacted before the 1992 amendment of § 504 of the Rehabilitation Act (and there is no suggestion that their enactment was prompted by an expectation of amendment), they do not fall into the subterfuge exception to the ADA's safe-harbor. Thus, whether or not Modderno stated a claim under the 1992 amendment of § 504 apart from the safe-harbor provision— a question on which we express no opinion— the coverage limitations challenged by Modderno cannot violate amended § 504.

\*     \*     \*

The judgment of the district court dismissing the complaint is

*Affirmed.*

GINSBURG, Circuit Judge, concurring:

I agree with the court's dismissal of Modderno's claim. The disparate treatment of which she complains is that between physical impairment on the one hand and mental impairment on the other. That disparity is permissible under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, because it is unrelated to disability, defined as a substantial limitation upon one or more of a person's major life activities, *id.* § 706(8)(B)(i).

I write separately because I believe that by resting its affirmance upon this unobjectionable point, the court misses the more general and more fundamental principle: only by providing less coverage to some or all persons who are currently disabled does an insurance plan contravene § 504. As a result of this oversight the court mistakenly suggests, albeit in *dicta,* that a plan might violate § 504 if it covered a non-disabling illness but not a disabling version of the same illness. *See* Court Op. at 1061.

In this case the same insurance coverage was made available to all regardless of handicap; there is no indication and no claim that the benefits were only formally but not meaningfully available to the handicapped. *See Alexander v. Choate,* 469 U.S. 287, 302, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985) (disabled must "benefit meaningfully from the coverage they will receive"). Unless some coverage is denied to persons who currently have a disabling condition while at the same time granted to those who do not currently have a disabling condition, or denied to persons with a particular disability but not to persons with a different disability, there is no discrimination on account of disability. Equal coverage for all is non-discriminatory. That is the fundamental ground upon which Modderno's claim fails.

True enough, some facially neutral coverage may lead to significantly disparate outcomes. In *Alexander* the Supreme Court refused to rule out a disparate impact claim. *Id.* at 299, 105 S.Ct. at 719. If it can be demonstrated that seemingly equal coverage necessarily and significantly favors the currently non-disabled over the currently disabled, and if the differences are so substantial as effectively to deny the disabled meaningful access to coverage, then perhaps a disparate impact claim can be made out.

In *Alexander* the Court approved a reduction in inpatient coverage that left "both handicapped and nonhandicapped Medicaid users with identical and effective hospital services fully available for their use, with both classes of users subject to the same durational limitation." *Id.* at 302, 105 S.Ct. at 721. The Court went on to note that "[s]ection 504 does not require the State to alter ... the benefit being offered simply to meet the reality that the handicapped have greater medical needs." *Id.* at 303, 105 S.Ct. at 721. Further: "The [Rehabilitation] Act does not ... guarantee the handicapped equal results," *id.* at 304, 105 S.Ct. at 722, nor is § 504 intended "to make major inroads on the States' longstanding discretion to choose the proper mix of amount, scope, and duration limitations on services covered by state Medicaid," *id.* at 307, 105 S.Ct. at 723. Indeed, "to require that the sort of broad-based distributive decision ... always be made in the way most favorable, or least disadvantageous, to the handicapped, even *when the same benefit is meaningfully and equally offered to them,* would be to impose a virtually unworkable requirement on state Medicaid workers." *Id.* at 308, 105 S.Ct. at 724 (emphasis added).

With *Alexander* as our guide, it seems to me that § 504 does not invalidate an insurance plan merely because it covers a particular illness up to the point at which it becomes disabling, but not thereafter, nor because it excludes coverage of particular illnesses that are inherently disabling. As long as the Foreign Service Benefit Plan offers the same coverage to all insureds, regardless of disability, it cannot be said to discriminate on the basis of disability.