Harold LEWIS, Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY,
and Kmart Corporation,
Defendants.

Civil Action No. 97–1230–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 24, 1997.

Victor M. Glasberg, Jeanne Goldberg, Alexandria, VA, for plaintiff.

Phyllis E. Andes, John C. Fox, Craig A. Selness, Fenwick & West, LLP, Washington, DC, for Kmart.

Ronald S. Cooper, Tracy Zorpette, Brian A. Davis, Steptoe & Johnson, LLP, Washington, DC, for Aetna.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court are the defendants' Motions to Dismiss, and plaintiff's Motion for Preliminary Injunction, in a case of first impression in the Fourth Circuit.

### I. Factual Background

Plaintiff, Harold Lewis, is a 43 year-old Virginia resident who has suffered from severe depression since 1979.[1] After the onset of his condition, plaintiff sought and received treatment, and was able to function normally. In 1984, plaintiff obtained employment with defendant Kmart Corporation, through which he was offered and enrolled in a disability insurance plan provided by defendant Aetna. Lewis claims, and defendants do not dispute, that he paid all necessary premiums and fulfilled all other plan obligations.

In 1995, Lewis' conditioned worsened, and by March of that year he took leave from his position as Store Manager. Lewis was unable to return to work and began receiving disability benefits under the Aetna plan on September 19, 1995. Under the plan, disability payments are made to qualified recipients until they reach age sixty-five; however, the plan provides that:

> After the first twenty-four months of the period of total disability, such period shall be deemed to terminate as of any date on which the total disability is caused by any condition other than a medically determinable physical impairment.... The term "medically determinable physical impairment" shall mean a physical impairment which results from anatomical or physiological abnormalities which are **exclusively organic and non-psychiatric** in nature and which are demonstrated by medically acceptable clinical and laboratory techniques.

Complaint at ¶ 12 (emphasis added). Aetna informed plaintiff that his condition had been classified as **not** "exclusively organic and non-psychiatric in nature" and that plaintiff's

---

1. Plaintiff has submitted expert evidence to show that his condition is the result of a medically determinable biological impairment resulting from an "imbalance of certain chemicals in his brain" and "other organic problems," a condition he describes as "organic depression." However, plaintiff does not argue that his disability is physical rather than mental in nature.

benefits under the plan would therefore terminate as of September 19, 1997. Plaintiff subsequently brought the present action, claiming that defendants had discriminated against him on the basis of his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Specifically, Lewis alleges that Kmart violated his right to terms and conditions of employment free from discrimination based on his disability, and that Aetna violated his right to public accommodation free from discrimination based on his disability under 42 U.S.C. §§ 12112 and 12102, respectively.[2] Plaintiff seeks to enjoin defendants from terminating his disability benefits under the plan, in addition to declaratory and other relief.[3]

In the motions presently before the Court, defendants seek to dismiss plaintiff's claims under Fed.R.Civ.P. 12(b)(6), and plaintiff seeks a preliminary injunction barring defendants from terminating his disability benefits pending an adjudication of his claims.

## II. Discussion

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) is properly granted "where, assuming the facts in the complaint are true, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Miller v. Pulaski Sheriff's Dept.*, 30 F.3d 130 (4th Cir.1994). Here, assuming as true that plaintiff's insurance policy discriminates between mental and physical disabilities and the alleged facts concerning the nature of plaintiff's disability, defendants set forth three arguments for dismissal. First, plaintiff cannot bring a claim against Kmart pursuant to ADA Title I because he is not a "qualified individual with a disability." Second, plaintiff cannot bring a claim against Aetna pursuant to ADA Title III because

his employee benefits plan is not a good or service purchased in a place of public accommodation within the meaning of Title III. Finally, employee benefit plan distinctions between physical and mental disabilities do not violate either Title I or Title III of the ADA.

### A. Title I Standing: Plaintiff's Ability to Sue as a "Qualified Individual with a Disability"

Under the ADA, an employer may not discriminate against a "qualified individual with a disability" on the basis of that disability in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The "terms, conditions, and privileges of employment" include "[f]ringe benefits available by virtue of employment, whether or not administered by the [employer]." 29 C.F.R. § 1630.4(f) Plaintiff contends that, under a plain meaning interpretation of the above language, disability benefits provided to employees qualify as both a "privilege of employment" and a "fringe benefit available by virtue of employment" within the meaning of 42 U.S.C. § 12112(a). Consequently, plaintiff argues, disability benefits provided by an employer are subject to the protections of ADA Title I. In support, plaintiff cites *Schroeder v. Connecticut General Life Ins. Co.*, No. 93–M–2433, 1994 WL 909636, at *1 (D.Colo. Apr.22, 1994). In *Schroeder,* plaintiff alleged that a disability benefits plan made available to him through his employer violated the ADA because it provided inferior coverage for mental as opposed to physical disability. *Id.* at *3. The court, examining the language of § 12112, reasoned that the benefit plan at issue was a term and condition of plaintiff's employment, and that plaintiff's employer was therefore prohibited from offering discriminatory plans to its employees. *Id.* In particular, the court noted that

**2.** Plaintiff also initially asserted breach of contract and promissory estoppel claims against both defendants based on his disability benefit insurance contract with Aetna. These claims appear to be preempted by ERISA, and plaintiff has agreed to the dismissal of these claims.

**3.** Specifically, plaintiff seeks:

1. A preliminary injunction barring defendants from terminating his disability benefits pending an adjudication of his claims;
2. A declaration that defendants have violated his rights under the ADA;
3. A permanent injunction barring defendants from terminating his benefits under the insurance policy on the basis of the mental/physical distinction described above; and
4. An award of costs and attorney's fees.

section 12112(b)(2) expressly prohibits an employer from "participating in a contractual or other arrangement ... [with] an organization providing fringe benefits to an employee" that has the effect of subjecting that employee to discrimination on the basis of disability. On the basis of this provision, the court concluded that plaintiff's employer was subject to the prohibitions of Title I even though the plan was actually issued by a third party insurer. *Id.* This interpretation appears to be consistent with the views of the EEOC, which has advocated the application of ADA Title I protection to employer-provided disability benefits. *See EEOC v. CNA Ins. Co.*, 96 F.3d 1039, 1043 (7th Cir.1996) (EEOC seeks to enjoin former employer from terminating long term disability benefits for a person disabled by mental illness while not imposing similar limits on those with physical disabilities); *Leonard F. v. Isreal Discount Bank of New York*, No. 95 Civ. 6964(CLB), 1996 WL 634860, at *3 (S.D.N.Y. Sept.24, 1996) (EEOC advocates application of Title I protection for bank employee suing bank regarding disability plan which provided inferior benefits for mental as opposed to physical disability) *subsequent proceedings*, 967 F.Supp. 802 (S.D.N.Y.1997).

■■■ The Aetna disability plan at issue here was offered to Kmart employees as a benefit made available by virtue of their employment with Kmart. Consequently, under the plain meaning interpretation of 42 U.S.C. § 12112(a) and 29 C.F.R. § 1630.4(f) adopted in *Schroeder*, the Aetna plan qualifies as both a "privilege of employment" and as a "fringe benefit available by virtue of employment" within the meaning of 42 U.S.C. § 12112(a). Accordingly, the ADA prohibits Kmart from offering a "qualified individual with a disability" disability benefits that discriminate on the basis of that disability. This is true whether Kmart provides the disability benefits itself, or offers benefits issued by a third party insurer such as Aetna. *See* 42 U.S.C. § 12112(b)(2).

The question remains, however, as to whether Lewis is a "qualified individual with a disability." The Fourth Circuit has held that, in order to obtain relief under the protections of ADA Title I, an employee must demonstrate that he is a "qualified individual with a disability" within the meaning of the statute. *See* 42 U.S.C. § 12112(a); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683 (4th Cir.1997); *Carrozza v. Howard County*, No. 94–1593, 1995 WL 8033, at *1 (4th Cir. Jan.10, 1995). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [the] individual holds or desires." 42 U.S.C. § 12111(8). Thus, in *Martinson*, plaintiff, a shoe store clerk who was unable to perform essential security functions because of episodic bouts of epilepsy, could not maintain suit as a "qualified individual with a disability" pursuant to ADA Title I. *Martinson*, 104 F.3d at 683–87. Similarly, in *Carrozza*, plaintiff, a typist unable to use word processing software and to perform other essential office functions because she suffered from bipolar disorder, was not a "qualified individual with a disability" for purposes of ADA Title I. *Carrozza*, 1995 WL 8033 at **1–2. In light of these cases, defendant Kmart contends that, because plaintiff is totally unable to perform work functions, plaintiff cannot be a "qualified individual with a disability." Consequently, defendant argues, plaintiff lacks standing to sue for violation of ADA Title I.

In support of this construction of Title I, defendant cites *Parker v. Metropolitan Life Ins. Co.*, 875 F.Supp. 1321 (W.D.Tenn.1995), *aff'd in part and rev'd in part*, 99 F.3d 181 (6th Cir.1996), *reh'g en banc granted, judgment vacated*, 107 F.3d 359 (6th Cir.1997), *reh'g en banc*, 121 F.3d 1006 (6th Cir.1997), and *CNA*, 96 F.3d at 1039. In both cases, plaintiff-employees obtained long term disability insurance plans issued by a third party insurer through their employers. *Parker*, 875 F.Supp. at 1323; *CNA*, 96 F.3d at 1041. As in the present case, the plaintiffs purchased plans that provided benefits for physical disabilities through age sixty-five, but limited benefits for mental disabilities to twenty-four months. *Parker*, 875 F.Supp. at 1323; *CNA*, 96 F.3d at 1041. During the course of their employment, both plaintiffs became completely unable to perform work functions due to mental disabilities, and be-

gan receiving disability benefits under their respective plans. *Parker,* 875 F.Supp. at 1323; *CNA,* 96 F.3d at 1041. When their benefits threatened to run out, both plaintiffs brought suit against their employers under Title I of the ADA. *Parker,* 875 F.Supp. at 1323; *CNA,* 96 F.3d at 1041. Construing Title I, both the *Parker* and *CNA* court held that plaintiffs could not maintain suits against their employers pursuant to Title I because neither plaintiff could demonstrate herself to be a "qualified individual with a disability." *See Parker,* 875 F.Supp. at 1325–26, *CNA,* 96 F.3d at 1043–45. The Sixth Circuit explained that "Ms. Parker was at no time a 'qualified individual with a disability.' At the time she could 'perform the essential functions' of her job, she was not disabled for purposes of her long term disability claim, and therefore was not covered by the Disabilities Act, and at the time her insurance benefits were terminated, she could no longer perform her job." *Parker,* 99 F.3d at 186. Defendant argues that Mr. Lewis is similarly barred from asserting Title I claims in the present action.

In response, plaintiff argues that a rational interpretation of Title I in the context of disability benefits requires an expansive interpretation of § 12112(a). In particular, plaintiff contends that Lewis' employment with Kmart and acceptance of disability benefits during the course of that relationship are factors that "qualify" him to bring suit pursuant to Title I. As plaintiff points out, this approach is consistent with the interpretation urged by the EEOC, which has asserted that:

> the relevant 'employment position' in any case involving post-employment fringe benefits, is the position actually occupied by plaintiff, that of benefit recipient, and that as long as the plaintiff satisfies any non-discriminatory eligibility criteria for receipt of benefits, he is a 'qualified individual' within the meaning of the ADA.

*Leonard,* 1996 WL 634860 at *3.

■ With all due respect to the Sixth and Seventh Circuits, this Court declines to follow the narrow view of the ADA proffered by defendants, and concurs with the plaintiff's more expansive view. The Fourth Circuit

precedent reflected in *Martin* and *Carrozza* does not conflict with this approach because Lewis was a "qualified individual with a disability" at the time of the alleged discrimination. As plaintiff alleges, he has suffered from severe, organically based depression since 1979. Nevertheless, Lewis was able to control his symptoms through the use of medication well enough to perform his duties as a Kmart employee and earn him several promotions over the course of his employment. As such, plaintiff clearly qualifies as an individual with a disability who was, nonetheless, able to perform the "essential functions" associated with his employment. Plaintiff must therefore be considered a "qualified individual with a disability" during the scope of his employment with Kmart. *See* 42 U.S.C. § 12112(a); 42 U.S.C. § 12111(8). Furthermore, to the extent that plaintiff has suffered discrimination within the purview of the ADA, it occurred when he was offered a disability benefits plan that provided inferior coverage for disabilities that were mental rather than exclusively physical in nature. This plan was offered to plaintiff while he worked for Kmart. Thus, plaintiff was a "qualified individual with a disability" at the time of the alleged discrimination, even though his actual injury did not occur until his benefits stopped. Plaintiff's right to maintain a claim for discrimination pursuant to ADA Title I therefore vested at that time, and continues although plaintiff is now no longer able to perform his duties as an employee.

This interpretation of 42 U.S.C. § 12112(a) accords both with the language of and the policies behind the ADA. Conversely, the interpretation urged by defendant, that Lewis cannot maintain suit as a "qualified individual" because he was totally disabled at the time he actually began collecting disability benefits under the Aetna plan, yields an irrational result. Under this interpretation, Lewis would lack standing to sue under Title I until he had claimed benefits under the disability policy. In order to obtain benefits, however, Lewis would be required to show that he was totally disabled and unable to perform the functions required by his position. By doing so, Lewis would render him-

self unable to maintain suit as a "qualified individual with a disability" pursuant to Title I. Such an interpretation would effectively prevent any plaintiff from challenging an employer's provision of disability benefits as discriminatory under Title I of the ADA. So enormous a gap in the protection afforded by Title I would be clearly at odds with the expressed purpose of the ADA to "address the major areas of discrimination faced day-to-day by people with disabilities," 42 U.S.C. § 12101(b), and "to bring individuals with disabilities into the economic and social mainstream of American life ... in a clear, balanced, and reasonable manner." H.R.Rep. No. 485, 101st Cong. pt. 2, at 99 (1990).

The *Parker* and *CNA* courts were not faced with a plaintiff who claimed to be a "qualified employee with a disability" at the time an allegedly discriminatory plan was offered to him. *See Parker*, 99 F.3d at 185; *CNA*, 96 F.3d at 1044–45. Unlike Lewis, the plaintiffs in both cases appear to have become disabled after they were offered the plans alleged to be discriminatory.[4] Consequently, this Court must be cautious in applying the Title I findings of *Parker* and *CNA* to the instant case. Both *CNA* and *Parker* might be read to stand for the proposition that an individual who was a "qualified individual with a disability" and subject to discrimination during the course of his employment may no longer maintain a Title I claim after he has become totally disabled and begun receiving disability benefits. To the extent that these cases so hold, this Court declines to follow their interpretation for the reasons given above. Accordingly, this Court concludes that Lewis was a "qualified individual with a disability" at the time that the allegedly discriminatory plan was offered to him, and is therefore entitled to sue under ADA Title I to redress the effects of that discrimination. Having reached this conclusion, this Court must next determine whether plaintiff may maintain his discrimination claims against Aetna pursuant to ADA Title III.

---

**4.** Specifically, the *CNA* court considered plaintiff's claim that a person who had not been a "qualified individual with a disability" during the course of her employment could nevertheless maintain a Title I claim against her employer on

## B. Title III Standing: The Aetna Plan as a Good or Service Provided by a Place of Public Accommodation

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Under 42 U.S.C. § 12181(F), the definition of a "public accommodation" includes an "insurance office." Federal regulations construing Title III define a "place of public accommodation" as a "facility," and define a facility as, *inter alia,* "buildings, structures, sites...." 28 C.F.R. § 36.104.

Defendant Aetna contends that the protections of § 12182 do not extend to the contents of insurance policies, and that, even if they do, those protections do not apply in the instant case because Lewis did not physically purchase his Aetna policy from an "insurance office" or other "place of public accommodation." *See* 42 U.S.C. § 12181(F), 28 C.F.R. § 36.104.

Plaintiff opposes this restrictive reading of Title III, relying in part on the Department of Justice position that "[i]nsurance offices are places of public accommodation and, as such, may not discriminate on the basis of disability in the sale of insurance contracts or in the terms or conditions of the insurance contracts that they offer." Dep't of Justice, Americans with Disabilities Act Technical Assistance Manual, § III–3.11000. Similarly, several federal courts considering the reach of Title III have concluded that it reaches the sale of insurance policies, and have allowed Title III actions against insurers on this basis. *See Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England,* 37 F.3d 12, 20 (1st Cir.1994); *World Ins., Co. v. Branch,* 966 F.Supp. 1203, 1207 (N.D.Ga.1997); *Cloutier v. Prudential Ins. Co. of Am.,* 964 F.Supp. 299, 301

the grounds that the offered plan discriminated against able-bodied employees who would *in the future* become disabled due to mental rather than physical conditions. *CNA,* 96 F.3d at 1044. We need not, and do not, consider such a claim.

(N.D.Cal.1996); *Kotev v. First Colony Life Ins. Co.,* 927 F.Supp. 1316, 1321–22 (C.D.Cal. 1996); *Baker v. Hartford Life Ins. Co.,* No. 94C 4416, 1995 WL 573430, *3 (N.D.Ill. Sept.28, 1995).

In response, defendant contends that, even if the protections of Title III extend to insurance policies provided by an "insurance office," plaintiff did not seek the goods or services of such a public accommodation here because he did not physically enter an insurance office to purchase his Aetna policy. *See Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1007 (6th Cir.1997) (en banc); discussion of *Parker supra.* Parker brought claims essentially identical to those at issue here. Narrowly construing the language of Title III, a majority of the Sixth Circuit reasoned that goods and services offered by a "place of public accommodation" referred only to goods and services purchased on the physical premises of a covered business.[5] *Id.* at 1010. The court therefore concluded that plaintiff lacked Title III standing because she did not physically enter the insurer's place of business to purchase her policy.[6] *Id.* The court explained that:

> While we agree that an insurance office is a public accommodation as expressly set forth in § 12181(7), plaintiff did not seek the goods and services of an insurance office. Rather, Parker accessed a benefit plan provided by her private employer and issued by MetLife. A benefit plan offered by an employer is not a good offered by a place of public accommodation. As is evident by § 12187(7), a public accommodation is a physical place and this Court has previously so held.

*Id.* (citations omitted). Citing this ruling, defendant argues that Lewis, like Parker, may not assert a claim against Aetna under Title III because he did not physically enter the offices of Aetna to purchase his policy and consequently did not purchase a good or service from a place of public accommodation within the meaning of ADA Title III.

In response, plaintiff points out that nothing in the language of § 12182(a) requires that a good or service offered by a place of public accommodation be purchased on the physical premises of that office in order for the protections of Title III to apply. *See* 42 U.S.C. § 12182(a), 12181(7)(F). In accordance with plaintiff's position, several courts interpreting Title III have concluded that its protections extend to goods not purchased in a physical office. For example, the First Circuit concluded in *Carparts* that "[t]he plain meaning of [§ 12182(a) and 12181(7)(F)] do not require 'public accommodations' to have physical structures for persons to enter," and that "[n]either Title III nor its implementing regulations make any mention of physical entry." 37 F.3d at 19. On this basis the First Circuit concluded that plaintiff could maintain his Title III claims against his insurer even though he had not actually entered a physical office in order to purchase his policy. *Id.* at 18–21; *accord Branch,* 966 F.Supp. at 1203; *Kotev,* 927 F.Supp. at 1322; *Baker,* 1995 WL 573430 at *1.

Furthermore, as the First Circuit and other courts have concluded, ignoring the language of Title III and adopting the construction urged by defendant yields an irrational result. *See Carparts,* 37 F.3d at 13; *Branch,* 966 F.Supp. at 1203; *Kotev,* 927 F.Supp. at

---

**5.** In a strong dissent, Judge Merrit argued that the narrow interpretation adopted by the en banc panel leads to an irrational result: "It boggles the mind to think that Congress would include only the few people who walk into an insurance office to buy health insurance but not the millions who get such insurance at work. This distinction drawn by the Court produces an absurd result." See *Parker,* 121 F.3d 1006, 1021 (Merrit, J., dissenting). Judge Merrit further noted that so-called "safe harbor" provisions applicable specifically to the insurance industry would be superfluous if the ADA did not contemplate the ability of the insureds to sue their insurer under Title III.

**6.** Similarly, both the Southern District of Ohio and the Northern District of California have reached the conclusion that some nexus to an actual physical place where goods and services are sold is required in order to find discrimination under Title III. *See Martin Schaaf v. Association of Educational Therapists,* No. C94–03315 CW, 1995 WL 381979 (N.D.Cal. Jun.13, 1995); *Pappas v. Bethesda Hosp. Ass'n,* 861 F.Supp. 616 (S.D.Ohio 1994). We decline to adopt this interpretation of Title III, for the reasons set forth *infra.*

1322; *Baker*, 1995 WL 573430 at *1. Under the interpretation urged by defendant, a place of public accommodation would be barred by Title III from discriminating in the provision of goods and services sold on its physical premises, but the same establishment would be free to discriminate in the provision of goods and services purchased by mail order or by telephone. Thus, a department store which could not refuse to sell shoes to disabled customers who visited the store's downtown business location could freely refuse services to disabled customers who ordered from the store's catalog. It is difficult to believe that Congress intended to withhold the protections of the ADA from the millions of disabled persons who buy their goods by telephone, mail-order, or home delivery without ever entering the physical premises of a business establishment. It is even more difficult to believe that Congress intended this result to apply to the insurance industry, whose goods and services (insurance policies) are routinely purchased by customers who never set foot in an insurance office, as is the case here.[7] Indeed, under defendants' construction, an insurer could freely discriminate in the provision of insurance without fear of ADA Title III simply by not maintaining a physical office or by marketing its policies via the U.S. mail. This would directly conflict with Congress' purpose in enacting the ADA to "provide a clear and comprehensive mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b).

Defendant also points out that Lewis did not purchase his policy directly from Aetna, but instead obtained the policy through his employer. This distinction is unavailing in light of the language of Title III. *See* 42 U.S.C. § 12182(b)(1)(A)(I). Specifically, § 12182(b)(1)(A)(I) provides that:

> [i]t shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, **directly, or through contractual licensing, or other arrangements,** to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities,

> privileges, advantages, or accommodations of an entity.

*Id.* (emphasis added). Thus, an insurer may not discriminate in the provision of insurance regardless of whether the policy is sold directly to a disabled individual or made available to that individual indirectly via an employer pursuant to a contractual or other relationship.

■ For the reasons set forth above, this Court concludes that Title III prohibits an insurer from discriminating on the basis of disability in the insurance policies that it offers, whether these policies are purchased at the office of the insurer or otherwise, and whether they are purchased directly by an insured or made available to him by his employer.

## C. Physical/Mental Distinctions in Employee Benefit Plans as Discrimination in Violation of the ADA

Having determined that plaintiff has standing to sue defendant Kmart pursuant to Title I, and defendant Aetna pursuant to Title III of the ADA, the Court must determine whether the distinction between benefits for mental versus physical disabilities constitutes discrimination on the basis of disability in violation of the ADA.

As defendants point out, in insurance matters, the protections of ADA Titles I–III are limited by a so-called "safe harbor" provision set forth in Title IV at 42 U.S.C. § 12201(c). This section provides at paragraph (1) that: "[s]ubchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict ... an insurer ... from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law." *Id.* However, § 12201(c) also provides that "[p]aragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter I and III of this chapter." *Id.* The meaning of the § 12201(c)(1) "safe harbor" provision is not clear on its face and therefore, as other courts have pointed out, merits a consideration of the legislative history be-

---

**7.** On this point, *see Parker,* 121 F.3d 1006, 1021

(Merrit, J., dissenting).

hind it. Construing § 12201(c), the House has explained that:

> Under the [ADA], a person with a disability cannot be denied insurance or be subject to different terms and conditions of insurance based on disability alone, if the disability does not impose increased risks.... Moreover, while a plan which limits certain kinds of coverage based on classification of risk would be allowed under this section, the plan may not refuse to insure, or limit the amount, extent, or kind of coverage available ... solely because of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.

H.R.Rep. No.45, 101st Cong. pt. 2, at 136–37 (1990). The same report goes on to explain that:

> Specifically, [section § 12201(c) ] makes it clear that insurers may continue to sell and to underwrite individuals applying for life, health, or other insurance on an individually underwritten basis, or to service such products, so long as the standards used are based on sound actuarial data and not on speculation.... In sum, [the ADA] requires that underwriting and classification of risks be based on sound actuarial principles or be related to actual or reasonably anticipated experience.

H.R.Rep. No. 45, 101st Cong. pt. 3, at 70 (1990). Senate legislative history concerning § 12201(c) and Department of Justice guidelines for implementing § 12201(c) use essentially similar language. *See* S.Rep. No. 116, 101st Cong., 4–6 (1990); Dep't of Justice, Americans with Disabilities Act Technical Assistance Manual, § III–3.11000.

As plaintiff points out, several courts have interpreted the language of § 12201(c) and the legislative history associated with it to mean that insurance practices which treat disabled individuals differently based on their disability are protected only to the extent that they are supported by actuarial data or the actual experience of the insurer regarding the risk at issue. In *Doukas*, 950 F.Supp. at 432, the court held that, in denying plaintiff coverage on the basis of her

bipolar disorder, defendant insurer was required not only to conform its actions to the requirements of state law, but that, under the ADA "[its] methods must still be based on sound actuarial principles or related to actual or reasonably anticipated experience." Because neither party had introduced sufficient evidence as to the potential actuarial basis for the defendant's decision to deny coverage, the court denied either party judgment as a matter of law. *Id.* In *Branch*, 966 F.Supp. at 1208, the court extended this principle to plan distinctions that target particular disabilities, in particular a $5,000 cap on coverage for AIDS related expenses where coverage for other illnesses extended to $2,000,000, concluding that "[t]he principle ... appears to be that insurance practices are protected to the extent that they are in accord with sound actuarial principles, reasonably anticipated experience, or bona fide risk classification." *Id.* Because the insurer had utterly failed to present actuarial evidence to explain the differential treatment, the court granted the insured's counterclaim under ADA Title III. *Id.* In *Baker*, 1995 WL 573430 at *4, the court concluded that defendant insurer's denial of coverage to a plaintiff subject to seizures would be permitted under § 12201(c) "if the decision not to insure plaintiff constituted underwriting or classifying risks," but that a plaintiff subject to discrimination on the basis of a disability may be entitled to recovery under the ADA if the decision "was not based on considerations of underwriting or classifying risks." *Id.* In light of these cases, plaintiff contends that the distinction in coverage between mental and physical abilities at issue may be upheld only if it is based on actuarial principles or other competent factual basis.

In response, defendants contend that, while the ADA clearly prohibits discrimination on the basis of a mental disability, no such discrimination has taken place in the present case. Specifically, defendants note that plaintiff has not been denied coverage on the basis of his mental disability, or been offered benefits different from those available to others because of it. Instead, plaintiff was offered the same disability benefits plan made available to all other Kmart em-

ployees, both disabled and able-bodied. In support of their position, defendants cite *Parker, CNA,* and *Krauel v. Iowa Methodist Medical Center.*[8] *See Parker,* 121 F.3d at 1015; *CNA* 96 F.3d at 1044; *Krauel,* 95 F.3d 674, 678 (8th Cir.1996). Although all three cases were decided on so-called "standing" issues under Titles I and III, and were therefore not required to determine whether distinctions like the one at issue here violate the ADA, their reasoning needs to be addressed. As the *Parker* court, considering a mental/physical distinction in benefits treatment essentially similar to the one at issue here, explained:

> The disparity in benefits provided in the policy at issue is [ ] not prohibited by the ADA because the ADA does not mandate equality between the disabled and the non-disabled; specifically, the ADA mandates that the owners, lessors, and operators of public accommodations provide equal access to the disabled and non-disabled. Because all employees at Schering–Plough, whether disabled or not, received the same access to the long-term disability plan, neither the defendants nor the plan discriminated between the disabled and the able bodied.

*Parker,* 121 F.3d at 1015.

Similarly, in *CNA,* the Seventh Circuit noted that "[a]ll employees—the perfectly healthy, the physically disabled, and the mentally disabled—had a plan that promised them long-term benefits from the onset of disability until age 65 if their problem was physical, and long-term benefits for two years if the problem was mental or nervous."

*CNA,* 96 F.3d at 1044. The court concluded that "[t]his may or may not be the enlightened way to do things, but it was not discriminatory in the usual sense of the term." *Id.* (citations omitted).

Lastly, in *Krauel,* the Eighth Circuit noted that an insurance plan that excluded coverage for infertility problems could not constitute disability based discrimination in violation of the ADA because the challenged exclusion "does not single out a particular group of disabilities, ... [r]ather, the Plan's infertility exclusion applies equally to all individuals, in that no one participating in the Plan receives coverage for the treatment of infertility problems." *Krauel,* 95 F.3d at 674.

On the basis of these cases, defendants argue that the distinction between mental and physical benefits at issue here merely constitutes discrimination between disabilities rather than discrimination between the disabled and the non-disabled, and as such does not constitute unlawful discrimination in violation of the ADA. Defendants correctly note that the majority of benefit cases cited by plaintiff deal with the denial of coverage on the basis of a particular disability, and that no such denial has taken place here. *See, e.g., Cloutier,* 964 F.Supp. at 299 (claim based on denial of coverage); *Kotev,* 927 F.Supp. at 1316 (same); *Doukas,* 950 F.Supp. at 432 (same); *Baker* 1995 WL 573430, at *1 (same).

The *Branch* court declined to adopt this line of reasoning, finding that the broad anti-

---

8. Defendants also cite two cases construing the Rehabilitation Act, a close relative of the ADA, for the proposition that distinctions like those at issue here do not constitute unlawful discrimination. *See Alexander v. Choate,* 469 U.S. 287, 304, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985); *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988). As the original *Parker* appellate court pointed out, these cases are inapposite. *See Parker,* 99 F.3d at 190 n. 4. *Alexander* dealt with general limitations on the availability of Medicare benefits, such as a limit on inpatient hospital days, which applied equally to all recipients. *Traynor* held that it was lawful under the Rehabilitation Act to deny benefits to veterans if their disability was the result of their own intentional conduct. Neither case dealt with the explicit discrimination against a partic-

ular category of disability alleged here. Consequently, defendants' reliance on *Modderno v. King* is also misplaced. 82 F.3d 1059 (D.C.Cir. 1996). In *Modderno,* the First Circuit concluded that the facially neutral limitations approved in *Traynor* and *Alexander* justified inferior benefits for mental health conditions in a plan covered by the Rehabilitation Act. *Id.* at 1060. This is not a reasonable extension of the holdings in those cases. Furthermore, even if such distinctions are valid under the Rehabilitation Act, the ADA was enacted because "current laws [e.g. the Rehabilitation Act] were 'inadequate' to combat the pervasive problems of discrimination that people with disabilities are facing.'" *Helen L. v. DiDario,* 46 F.3d 325, 331 (3d Cir.1995) (quoting S.Rep. No. 116, 101st Cong., 1 (1989)).

discrimination principles of the ADA extended to plan distinctions which target a particular disability. See 966 F.Supp. at 1206–09. The court examined the actuarial justification requirements associated with § 12201(c) and the expressed purpose of the ADA to integrate the disabled into American social and economic life, and reasoned that: "Because access to health care is often integral to a disabled person's ability to participate in society, the court cannot imagine that an insurer could arbitrarily cap the benefits payable with respect to a particular disability without running afoul of this stated purpose." *Id.* at 1208. The court therefore held that plan distinctions that target a particular disability such as AIDS for inferior coverage require some actuarial justification in order to be valid under the ADA. *See Branch*, 966 F.Supp. at 1207. Applying this standard, the court granted summary judgment on the insured's Title III claims after finding "a complete absence of evidence demonstrating that plaintiff's decision to cap its coverage of AIDS was based on sound actuarial principles." *Id.* at 1209.

The *Branch* court's interpretation of the scope of the ADA is consistent with that of the EEOC, which has brought suit and filed *amici* briefs arguing that arbitrary distinctions between mental and physical disabilities in disability benefit plans constitute discrimination in violation of the ADA. *See, e.g., CNA*, 96 F.3d at 1039 (EEOC argues that inferior coverage for mental disabilities in disability benefits plan violates ADA); *EEOC v. Avamark Corp. et al.*, Civ. No. 97–734(RMV) (D.D.C.1997) (same); *EEOC v. Chase Manhattan Bank et al.*, Civ. No. 97–6620 (S.D.N.Y. filed Sept. 9, 1997) (same).[9]

■ After examining the arguments presented by both sides, this Court finds that the distinction drawn by defendants is illusory. Both a decision to deny coverage on the basis of mental disability and to provide inferior coverage for mental disabilities target the mentally disabled for inferior treatment. In both cases, an insurer has subjected the mentally disabled individual to treatment inferior to that accorded to others solely on the basis of that individual's disability. As discussed above, the ADA clearly prohibits discrimination on the basis of disability absent some actuarial justification. Defendants' attempt to categorize such discrimination as discrimination between categories of disability rather than discrimination between the disabled and the non-disabled fails here. Under defendants' logic, an employer could hire an employee with a physical disability over a more qualified employee with a mental disability solely because of the mental disability, without violating the ADA, simply because both applicants were members of the protected class.

■ Defendants' interpretation flies in the face of the language of the ADA, which prohibits discrimination against an "individual with a disability because of the disability of such individual." *See* 42 USC § 12112(a). That is, the ADA prohibits discrimination on the basis of an individual's particular disability. Thus, whether a disabled person is treated differently than a non-disabled person or another disabled person, the same wrong has occurred. That is, the person has been discriminated against because of his particular disability. The Supreme Court recently affirmed this exact principle within the context of age discrimination, a type of claim that often accompanies claims of disability under the ADA. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). As the Court explained: "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age." *Id.* Furthermore, the Court held that discrimination on the basis of age meant discrimination based on the condition of a particular individual, and not on that individual's membership in the protected class (those over 40 years of age). *Id.* at ——, 116 S.Ct. at 1307. Thus, the ADEA "does not ban discrimination against employees because they are aged 40 or older; it bans discrimina-

9. Defendants note that the EEOC has in the past stated that distinctions between mental and physical illness in *health insurance* do not violate the ADA. *See* EEOC Interim Guidance on Applica-

tion of ADA to Health Insurance, June 3, 1993. To the extent that this was ever the position of the EEOC with regard to disability benefit plans, it does not appear to be so now.

tion because of their age, but limits the protected class to those who are 40 years or older." *Id.*

 Similarly, the ADA must be construed to prohibit discrimination against individuals based on their specific disability, and not merely to prohibit discrimination that negatively affects the disabled as a class.

 It would be incorrect, therefore, to find that, as defendants have argued, the ADA prohibits only discrimination between the disabled and the non-disabled, because the Court concludes that the ADA prohibits discrimination on the basis of an individual's particular disability. Only by doing so can the ADA achieve Congress' goal to "bring individuals with disabilities into the economic and social mainstream of American life." H.R.Rep. No. 45, 101st Cong. pt.2, at 99 (1990). Consequently, an insurer may not provide different levels of coverage for mental as opposed to physical disabilities unless such classification is grounded on sound actuarial principles or other competent factual basis.[10]

For the reasons set forth above, this Court concludes that plaintiff has. plead the requirements necessary to assert a claim against defendants Kmart and Aetna pursuant to Titles I and III of the ADA respectively. Furthermore, based on the language of the ADA and its express legislative history, the Aetna plan's distinction between physical and mental disabilities may survive scrutiny under the ADA only if it is based on actuarial principles or other competent factual information. Because no actuarial or other factual evidence concerning the distinctions, at issue has been presented to this Court, plaintiff's claims· must go forward. Therefore, defendants' respective motions to dismiss will be denied by an appropriate order.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

---

**10.** A plan distinction that has some actuarial basis may still run afoul of the ADA as· a "subterfuge" under the language of 42 U.S.C. § 12201(c). *See Branch,* 966 F.Supp. at 1209 n. 6; *Doukas,* 950 F.Supp. at 432; *Baker,* 1995 WL 573430 at *4. Both parties have proffered extensive arguments concerning the meaning of the "subterfuge" provision. Because this Court finds that the legislative history of § 12201(c) clearly requires some actuarial justification for plan distinctions like the one at issue here, and because it cannot yet be determined whether ·such a justification exists, this Court need not and does not· determine the exact meaning and effect of the "subterfuge" provision at this time.