**LEONARD F., Plaintiff–Appellant,**

v.

**ISRAEL DISCOUNT BANK OF NEW YORK, Defendant,**

and

**The Metropolitan Life Insurance Company, Defendant–Appellee.**

**Docket No. 98–7320.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 19, 1999.

Decided: Dec. 8, 1999.

Edward Copeland, New York, NY (Pauline H. Yoo, New York Lawyers for the Public Interest, New York, NY, Robert L. Schonfeld, Stein & Schonfeld, Garden City, on the brief), for Plaintiff–Appellant.

Allen I. Fagin, New York, NY (Aaron J. Schindel, Proskauer Rose LLP, Alvin Pasternak, Allan M. Marcus, Lawrence K., Wolff, Metropolitan Life Insurance Co., New York, NY, on the brief), for Defendant–Appellee.

Before: LEVAL and POOLER, Circuit Judges, and NEVAS, District Judge.*

* The Honorable Alan H. Nevas, United States District Judge for the District of Connecticut, sitting by designation.

LEVAL, Circuit Judge:

Plaintiff Leonard F. appeals from the judgment of the United States District Court for the Southern District of New York (Charles L. Brieant, Jr., *J.*) dismissing his complaint against Defendant The Metropolitan Life Insurance Company ("MetLife") for failure to state a claim under Fed.R.Civ.P. 12(b)(6). The complaint alleged (*inter alia*) that MetLife discriminated against Plaintiff on the basis of his mental disability in violation of Title III of the Americans with Disabilities Act (the "ADA" or "Act"), 42 U.S.C. §§ 12181–12189, by contracting with his employer, Defendant Israel Discount Bank of New York (the "Bank"), to provide him with a health insurance policy that limited coverage for mental disabilities to two years while providing coverage for physical disabilities that was not so limited. The district court dismissed the complaint, finding that because MetLife's policy is consistent with state law and does not constitute a subterfuge to evade the purposes of the Act, MetLife is exempt from Plaintiff's Title III claim under the "safe harbor" provision of Section 501(c) of the ADA, 42 U.S.C. § 12201(c). We agree with the district court's reasoning. However, we believe it erred in dismissing the complaint under Fed.R.Civ.P. 12(b)(6) based on a finding that relied on matter outside the pleadings without converting the motion to one for summary judgment and affording Plaintiff an opportunity to take discovery and contest the finding. We accordingly vacate and remand so that Plaintiff may have such an opportunity.

*Background*

A. *Relevant statutory provisions.*

Title I of the ADA, which generally prohibits discrimination on the basis of disability in the context of employment, *see*

42 U.S.C. §§ 12112–12117, provides in Section 102(a):

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... [the] terms, conditions, and privileges of employment.

*Id.* § 12112(a). A "covered entity" is defined in Title I to include "an employer." *Id.* § 12111(2).

Title III of the ADA, which generally prohibits discrimination on the basis of disability by so-called "public accommodations," *see id.* §§ 12181–12189, provides in Section 302(a):

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

*Id.* § 12182(a). Title III includes a long list of private entities that qualify as a "public accommodations" so long as their operations "affect commerce," including an "insurance office, professional office of a health care provider, hospital, or other service establishment." *Id.* § 12181(7)(F).

Section 501(c) of Title V of the ADA, known as the "safe harbor" provision, exempts insurers from the regulatory scope of Titles I through III of the Act if they meet certain conditions. It includes the following relevant language:

INSURANCE

Subchapters I through III of this chapter [i.e., Titles I through III of the ADA] and title IV of this Act shall not be construed to prohibit or restrict—

(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law....

*Id.* § 12201(c). The safe harbor provision also states, in its so-called "subterfuge clause":

> Paragraph[ ] (1) ... shall not be used as a subterfuge to evade the purposes of [Titles] I and III of [the Act].

*Id.*

B. *Events giving rise to this lawsuit.*

In 1987, the Bank hired Plaintiff as an Assistant Vice President. As a fringe benefit of employment, it furnished him short-term and long-term disability insurance coverage issued by MetLife. For persons with "mental" disabilities, the long-term disability ("LTD") plan limits benefits to two years. For persons with "physical" disabilities, the plan provides benefits up to age 65.

In April 1994, Plaintiff became disabled as a result of depression. After receiving benefits under the Bank's short-term disability plan, he applied for LTD benefits. MetLife approved his claim retroactive to October 1994.

In August 1995, Plaintiff filed this lawsuit in the United States District Court for the Southern District of New York. His original complaint named only his employer, the Bank, as a defendant. The complaint alleged that the Bank discriminated against him on the basis of his mental disability in violation of Title I of the ADA by imposing a two-year limit on benefits for mental disabilities, while imposing no such limit for physical disabilities.

In October 1996, MetLife terminated Plaintiff's benefits pursuant to the two-year cap on coverage for mental disabilities. Plaintiff was at that time, and continues to be, unable to work.

In November 1996, Plaintiff amended his complaint to add MetLife as a defendant, and to assert that both MetLife and the Bank violated Title III of the ADA by virtue of the shorter duration of coverage provided for mental, than for physical, dis-

abilities. The complaint also alleged that the shorter benefits limitation for mental disabilities constituted a "subterfuge to evade the purposes of the ADA" under Section 501(c) of Title V. Plaintiff sought a declaration that the Bank and MetLife were in violation of the ADA, and an injunction prohibiting MetLife "from continuing to provide long-term disability insurance in a manner that limits benefits for mental disorders to Leonard F."

In March 1997, the EEOC moved to intervene in Plaintiff's suit. In April 1997, the district court granted the motion, and in May, the EEOC filed its complaint-in-intervention, alleging principally that the LTD policy furnished by the Bank and issued by MetLife violated Title I of the ADA.

### C. The district court's ruling.

In January 1997, both Defendants moved to dismiss the Title III claims under Fed.R.Civ.P. 12(b)(6). In June 1997, Judge Brieant issued a Memorandum & Order granting the motions. *Leonard F. v. Israel Discount Bank,* 967 F.Supp. 802 (S.D.N.Y.1997). The court first held that Plaintiff cannot maintain an action against the Bank under Title III because his grievance does not relate to the "goods, services and facilities" that the Bank provides as a "public accommodation." *Id.* at 804. Instead, the court reasoned, Plaintiff's grievance pertains to "the terms and conditions of a benefit" the Bank furnished him in its capacity as his employer. *Id.* Accordingly, the court concluded, Plaintiff's claim against the Bank—if actionable under the ADA at all—lies under Title I of the Act, not Title III. *Id.* at 804, 806.

The district court dismissed the claim against MetLife as well, holding that Met-Life is protected by the safe harbor provision of Section 501(c). *Id.* at 805–06. The court reasoned that the safe harbor exempts insurance underwriters from the ADA's regulatory scope so long as their conduct complies with state law, *id.* at 805, and does not constitute a "subterfuge to evade the purposes of the [Act]." *See id.* at 806. Applying this standard to MetLife's LTD policy in the instant dispute, the court first found that "[p]roviding a time limitation on benefits for persons with mental disorders while not doing so for persons with physical disorders is consistent with state insurance law." *Id.* at 805. The court then found that MetLife's policy does not constitute a subterfuge to evade the purposes of the Act. *Id.* at 806. The court noted that in *Public Employees Retirement Sys. v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), a case involving the Age Discrimination in Employment Act ("ADEA"), the Supreme Court had ruled that a benefit plan adopted before the Act was passed could not be a subterfuge to evade the purposes of the Act. *Leonard F.,* 967 F.Supp. at 806. Finding that Congress intended that the ADA's subterfuge clause have the same meaning as the analogous clause in the ADEA, the district court determined that MetLife's LTD policy could not be a subterfuge, as it existed in its present form before the ADA was enacted in 1990. *Id.*

Plaintiff, having in the meantime settled his claims against the Bank, now appeals from the judgment in favor of MetLife.

### Discussion

Plaintiff advances two main arguments. (1) He contends that Congress, in enacting the ADA, intended to reject the *Betts* interpretation of "subterfuge," and included the subterfuge clause in Section 501(c) to require that insurance underwriters base their decisions with respect to disabled individuals on "sound actuarial principles." (2) He contends that the district court improperly reached beyond the pleadings to determine that (i) MetLife's LTD policy is consistent with state law, and (ii) the policy existed in its present form prior to the ADA's enactment.

### A. The proper interpretation of the safe harbor provision's subterfuge clause in Section 501(c).

Section 501(c) of Title V mandates in relevant part that Titles I through III of

the ADA shall not prevent insurers from "underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law," provided that this safe harbor "shall not be used as a subterfuge to evade the purposes of [Titles] I and III of [the Act]." 42 U.S.C. § 12201(c). The plain meaning of Section 501(c) is that insurers are exempt from regulation under the ADA so long as (i) their actions conform to state law, and (ii) they do not use the exemption as a "subterfuge to evade the purposes of [the Act]."

In *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), and then in *Betts,* the Supreme Court construed an analogous subterfuge clause in Section 4(f)(2) of the ADEA. This provision, before Congress amended it in 1990, exempted any bona fide employee benefit plan from the ADEA's general prohibition of age discrimination so long as the plan was not a " 'subterfuge to evade the purposes of [the Act]' " (and met certain other criteria). *McMann,* 434 U.S. at 195–96, 98 S.Ct. 444 (quoting 29 U.S.C. § 623(f)(2) (1988) (amended 1990)); *Betts,* 492 U.S. at 165–66, 109 S.Ct. 2854 (same).

The plaintiff in *McMann* challenged a retirement income plan established 26 years prior to the passage of the ADEA that called for compulsory retirement at age 60. *See* 434 U.S. at 194, 98 S.Ct. 444. The plaintiff argued, and the Fourth Circuit held, that the age–60 retirement provision was a "subterfuge to evade the purposes of the [ADEA]" unless the employer could show that this provision had some other economic or business purpose. *Id.* at 194–95, 98 S.Ct. 444.

In *Betts,* the plaintiff challenged a plan that rendered employees ineligible for disability retirement benefits once they reached age 60. *See* 492 U.S. at 162, 109 S.Ct. 2854. She maintained that, because her employer had not shown that the plan's age-based limitation was justified by age-related cost considerations, the plan constituted a "subterfuge to evade the pur-

poses of the ADEA." *Id.* at 169–72, 109 S.Ct. 2854. In support of her claim, the plaintiff cited Equal Employment Opportunity Commission (EEOC) interpretive regulations and legislative history consonant with her construction of the subterfuge clause. *See id.* The Sixth Circuit embraced her interpretation of the clause and ruled in her favor. *See id.* at 164–65, 109 S.Ct. 2854.

In both cases, the Supreme Court rejected the plaintiffs' arguments and reversed the courts of appeals. Construing the term "subterfuge" to have its ordinary meaning, including the necessary element of intent to evade, the Court held in *McMann,* and reaffirmed in *Betts,* that a benefit plan adopted prior to enactment of the ADEA could not be a "subterfuge to evade the purposes of the Act." *McMann,* 434 U.S. at 203, 98 S.Ct. 444; *Betts,* 492 U.S. at 167–68, 109 S.Ct. 2854. This conclusion followed because a plan adopted prior to the Act could not have been conceived in order to circumvent it. *See McMann,* 434 U.S. at 203, 98 S.Ct. 444 ("[A] plan established in 1941, if bona fide, ... cannot be a subterfuge to evade an Act passed 26 years later."); *Betts,* 492 U.S. at 167–68, 109 S.Ct. 2854 (confirming continued validity of the reasoning in *McMann* ).

The *Betts* Court, beyond reaffirming the Court's ruling in *McMann,* also held invalid the EEOC regulations construing the ADEA's subterfuge clause to require actuarial justification for age-based differences in plan benefits. *See Betts,* 492 U.S. at 170–72, 109 S.Ct. 2854. Noting that no deference is due to agency interpretations at odds with the statutory text, the *Betts* Court found that the EEOC regulations "cannot be squared with the plain language of the statute." *Id.* at 171, 109 S.Ct. 2854. For the same reason, the *Betts* Court was unswayed by the plaintiff's appeal to the ADEA's legislative history. Plaintiff argued that this history, like the regulations, supported her view that the subterfuge clause should be interpreted to require actuarial justification for age-based

differences; the Court reasoned that if Congress had intended to require such justification, it would have said so in the statutory text. *See id.* at 168–75, 109 S.Ct. 2854.

In construing the subterfuge clause in Section 501(c) of the ADA, all three of our sister circuits that have adjudicated the issue have adopted *Betts*'s interpretation of the analogous subterfuge clause in the ADEA. *See Ford v. Schering–Plough Corp.*, 145 F.3d 601, 611 (3d Cir.1998), *cert. denied*, — U.S. —, 119 S.Ct. 850, 142 L.Ed.2d 704 (1999); *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 678–79 (8th Cir.1996); *Modderno v. King*, 82 F.3d 1059, 1064–65 (D.C.Cir.1996), *cert. denied*, 519 U.S. 1094, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997). The D.C. Circuit in *Modderno* explained:

> *Betts* had been decided ... before Congress adopted the "subterfuge" language of § 501(c) of the ADA. Thus when Congress chose the term "subterfuge" for the insurance safe-harbor of the ADA, it was on full alert as to what the Court understood the word to mean and possessed (obviously) a full grasp of the linguistic devices available to avoid that meaning.

82 F.3d at 1065; *see also Ford*, 145 F.3d at 611 ("Congress enacted section 501(c) of the ADA in 1990, ... while the Supreme Court decided *Betts* in 1989. Congress therefore is presumed to have adopted the Supreme Court's interpretation of 'subterfuge' in the ADEA context when Congress enacted the ADA."); *Krauel*, 95 F.3d at 679 ("Had Congress intended to reject the *Betts* interpretation of subterfuge when it enacted the ADA, it could have done so expressly by incorporating language for that purpose into the bill that Congress voted on and the President signed.").

■ We find the reasoning of our sister circuits persuasive. Accordingly, we hold that the subterfuge clause in Section 501(c) of the ADA should be construed, as

in *Betts*, to require an intent to evade, making it inapplicable to a plan formulated prior to the passage of the Act regardless whether the plan relies on sound actuarial principles. When "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its ... judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, —, 118 S.Ct. 2196, 2208, 141 L.Ed.2d 540 (1998); *see also Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("[W]here ... Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."). Furthermore, we believe that applying *Betts*'s interpretation of a "subterfuge to evade the purposes of the Act" to Section 501(c) of the ADA is particularly appropriate because the *Betts* Court gave the clause its "ordinary meaning." *Betts*, 492 U.S. at 167, 109 S.Ct. 2854; *see, e.g., United States v. LaBonte*, 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) ("[W]e assume that in drafting ... legislation, Congress said what it meant[,] [g]iv[ing] the words used their 'ordinary meaning.' ").

Plaintiff, urging us not to rely on Congress's apparent adoption of the *Betts* interpretation or on the ordinary meaning of the subterfuge clause, maintains that we should instead construe the clause to require that underwriters base their decisions with respect to disabled individuals on "sound actuarial principles." In support of this contention, Plaintiff points to portions of the ADA's legislative history suggesting that Congress intended to reject the *Betts* interpretation, and that it included the subterfuge clause in Section 501(c) so as to prohibit underwriters from treating disabled persons differently except where actuarially justified.[1] That leg-

1. In support of his contention that Congress intended to reject the *Betts* definition, Plaintiff

islative history, Plaintiff contends, finds corroboration in interpretive guidelines promulgated by the Department of Justice (DOJ) and the EEOC, which endorse a similar construction of the subterfuge clause.[2]

We are not persuaded by Plaintiff's argument, principally because we believe that his interpretation of the subterfuge clause in Section 501(c) "cannot be squared with the plain language of the statute." *Betts*, 492 U.S. at 171, 109 S.Ct. 2854. Neither the subterfuge clause nor the safe harbor provision to which it belongs makes reference to "sound actuarial principles." *See* 42 U.S.C. 12201(c); *see also Rogers v. Department of Health and Envtl. Control*, 174 F.3d 431, 437 (4th Cir.1999) ("[W]e do not find anything in § 501(c) of the ADA (or anywhere else in the Act) that requires a plan sponsor or administrator to justify a plan's separate classification of mental disability with actuarial data."). Furthermore, the term "subterfuge" has a well-understood meaning that does not lend support to Plaintiff's construction. Merriam Webster's New Third International Dictionary defines a "subterfuge" as "a deception by artifice or a stratagem to conceal, escape, avoid or evade."[3] The Supreme Court in *McMann* and *Betts* observed that the term refers in ordinary parlance to "a scheme, plan, stratagem, or artifice of evasion." *McMann*, 434 U.S. at 203, 98 S.Ct. 444; *Betts*, 492 U.S. at 167, 109 S.Ct. 2854 (quoting *McMann*). In the context of the subterfuge clause of Section 501(c) of the ADA, neither the dictionary definition nor the Supreme Court's reasonably suggests that absence of actuarial justification for differential insurance benefits is sufficient to demonstrate a "subterfuge" to evade the purposes of an Act, at least where the insurance policy was adopted prior to the Act's passage.

▆▆ Assuming *arguendo* that we were to find that the legislative history supported Plaintiff's view, we would decline to accord it primacy over incompatible language in the Act. *See City of Chicago v. Environmental Defense Fund*, 511 U.S. 328, 337, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994) (legislative history cannot trump the plain meaning of a statute, because "it is the statute, and not the Committee Report, which is the authoritative expression of the law"); *cf. Ardestani v. INS*, 502 U.S. 129, 136, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) (courts should apply a "strong presumption that the legislative purpose is expressed by the ordinary meaning of the words used [in the statute]") (internal quotation marks omitted).[4]

cites several statements from the floor debates concerning the ADA's adoption. *See, e.g.*, 136 Cong. Rec. S9697 (daily ed. July 12, 1990) (statement of Sen. Kennedy); 136 Cong. Rec. H4624 (daily ed. July 12, 1990) (statement of Rep. Edwards). He also cites Committee Reports indicating that Congress intended to prohibit use of the safe harbor provision as a subterfuge "regardless of the date the insurance plan or employer benefit plan or employer benefit plan was adopted." S.Rep. No. 101–116, at 85 (1989); *see also* H.R.Rep. No. 101–485, pt. 2, at 137 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 420. In support of his contention that Congress included the subterfuge clause in Section 501(c) so as to require underwriters to base their decisions on "sound actuarial principles," Plaintiff cites several Committee Reports. *See, e.g.*, S.Rep. No. 101–116, at 85; H.R.Rep. No. 101–485, pt. 3., at 71 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 494.

**2.** In particular, Plaintiff cites DOJ's Preamble to Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities (July 26, 1991), *reprinted at* 28 C.F.R. Ch. 1, pt. 36, App. B, at 629 (1997); DOJ's Americans with Disabilities Act Title III Technical Assistance Manual § III–3.11000 at 18 (1992); and the EEOC's Interim Enforcement Guidance on the Application of the Americans with Disabilities Act of 1990 to Disability–Based Distinctions in Employer Provided Health Insurance 11 (1993).

**3.** Webster's New International Dictionary (3d ed.1976).

**4.** In any event, we believe that this legislative history is far less conclusive than Plaintiff contends, and provides only equivocal support for his reading of Section 501(c). For example, one of the key Committee Reports on which Plaintiff relies, S.Rep. No. 101–116 (1989), **Blue 33–34**, states in part that

For a similar reason, we do not defer to the DOJ and EEOC interpretive guidelines. While an agency's reasonable interpretation of an ambiguous provision in a statute that it administers is entitled to judicial deference, *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), "no deference is due to agency interpretations at odds with the plain language of the statute itself." *Betts,* 492 U.S. at 171, 109 S.Ct. 2854; *see also Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1012 n. 5 (6th Cir.1997) (in banc) (declining to defer to DOJ interpretive guidelines construing Section 501(c) to require underwriting based on "sound actuarial principles," because the guidelines are "inconsistent ... with the statutory text"), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *Krauel,* 95 F.3d at 679 (same reasoning with respect to EEOC guidelines); *Modderno,* 82 F.3d at 1065 (same, EEOC guidelines).[5]

For the foregoing reasons, we agree with the district court that, if MetLife's LTD policy is consistent with state law and was adopted prior to the passage of the ADA,[6] it is exempt from regulation under the Act pursuant to the safe harbor provision of Section 501(c), regardless whether it was based on actuarial experience.

B.  *Whether the district court based its dismissal of Plaintiff's complaint under Fed. R. Civ. P. 12(b)(6) on improper findings of fact.*

Plaintiff contends that, even if we reject his interpretation of the subterfuge clause in Section 501(c), we should nonetheless reverse the district court's judgment because the court improperly reached beyond the pleadings to make adverse factual determinations in dismissing his complaint under Fed.R.Civ.P. 12(b)(6). Specifically, he maintains that the court improperly found that MetLife's policy (i) is consistent with state law, and

---

the Committee added Section 501(c) to make it clear that this legislation will not disrupt the current nature of insurance underwriting or the current regulatory structure for self-insured employers or of the insurance industry in sales, underwriting, pricing, administrative and other services, claims and similar insurance activities based on classification of risks as regulated by the States. *Id.* at 84. We are not the first federal court of appeals to observe that construing Section 501(c) to require insurers to base their underwriting decisions on "sound actuarial principles" in all cases involving persons with disabilities would dramatically expand the federal role in the regulation of insurance and thereby "disrupt ... the current regulatory structure ... of the insurance industry." *See, e.g., Doe v. Mutual of Omaha,* 179 F.3d 557, 564 (7th Cir.1999) (Posner, C.J.) ("It is one thing to say that an insurance company may not refuse to deal with disabled persons; the prohibition of such refusals can probably be administered with relatively little interference with state insurance regulation.... It is another thing to require federal courts to determine whether limitations on coverage are actuarially sound ....") (internal citations omitted); *Ford,* 145 F.3d at 612 (construing Section 501(c) to mandate underwrit-

ing based on sound actuarial principles would "requir[e] insurers to justify their coverage plans in [federal] court after a mere allegation by a plaintiff," thereby effecting "a seismic shift in the insurance business").

5.  We note in passing that the degree of deference owed to informal agency pronouncements of the kind Plaintiff adduces remains unresolved. *See, e.g., Commissioner v. Keystone Consolidated Indus., Inc.,* 508 U.S. 152, 162 n. 3, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993) ("The resolution of that issue is deferred to another day."); *Mutual of Omaha, Ins.,* 179 F.3d at 563. We need not address that question in light of our conclusion that the agency interpretive guidelines on which Plaintiff relies do not comport with the plain meaning of the statutory text, at least insofar as they posit that an insurance plan designed prior to the enactment of the ADA may qualify as a "subterfuge evade the purposes of [the Act]."

6.  The insurance policy adopted prior to the ADA need not have been identical in all respects to the policy that Plaintiff challenges. What matters is whether the pre-Act policy contained the features that are alleged to violate the Act.

(ii) was adopted prior to the enactment of the ADA in 1990.

█ The district court committed no error with respect to the first point. Whether the policy is consistent with New York State law is a question of law, not fact. The district court was entitled to make its own determination on that question. Furthermore, Plaintiff neither pleaded inconsistency with state law, nor advanced any inconsistency with state law on this appeal.

█ On the other hand, we agree with Plaintiff that the court's finding with respect to MetLife's prior adoption of the policy was improper in the context of a motion to dismiss for failure to state a claim under Rule 12(b)(6). In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). Here, the complaint included no information as to the date that MetLife designed the policy. MetLife's moving papers asserted that the policy predated the

Act. Before the district court could credit this assertion and rule on that basis, it was required to convert Defendant's Rule 12(b)(6) motion into a motion for summary judgment and give Plaintiff an opportunity to contest the asserted fact. *See* Fed. R.Civ.P. 12(b) ("If, on a [12(b)(6) motion], ..., matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment ... and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

We accordingly vacate the judgment and remand the case so that Plaintiff may have an opportunity, with appropriate discovery, to contest whether the policy was adopted prior to the enactment of the ADA. We express no view on the degree of similarity that is required between MetLife's pre-ADA policies and the challenged policy to exempt it from being found a "subterfuge" under the test of *McMann* and *Betts*. If the district court confirms its earlier finding with respect to MetLife's prior adoption of the policy, it should reenter judgment on that basis.[7] Any appeal from the district court's judgment will be referred to this panel.[8]

7. If the finding is not confirmed, the district court should proceed to adjudicate on any other basis, whether under Rule 12(b)(6), on summary judgment, or after trial.

8. The district court indicated there might be other grounds on which to dismiss Plaintiff's complaint. For example, because the disputed policy was provided to Plaintiff by his employer as a fringe benefit, and was not purchased by Plaintiff from MetLife at an insurance office, a question arises whether Title III of the ADA has any application. *See Leonard F.*, 967 F.Supp. at 806 (suggesting that "Title III of the ADA is not applicable to employee benefits," and that "the plain meaning and legislative history of the ADA make[ ] clear that claims of discrimination in employee benefits are covered by Title I, not Title III"). While we have recently held in *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28 (2d Cir.1999), that an insurance office in its dealings with the public is a "place of public accommodation" and is regulated by Title III, it does not necessarily follow that Title

III is implicated when an insurance company issues a disability policy to an employer for the benefit of its employees. *See, e.g., Ford* 145 F.3d at 612–13 (holding that, because plaintiff "received her disability benefits via her employment," and "had no nexus to [defendant's] 'insurance office,'" she "was not discriminated against in connection with a public accommodation," and therefore could not state a claim under Title III); *Parker* 121 F.3d at 1011 (same). (Were the district court to dismiss under Rule 12(b)(6) on the ground that the claim pleaded arises under Title I, not Title III, presumably it would allow Plaintiff to replead to allege a violation of Title I.)

A question also arises whether Title III, to the extent it covers insurers, merely forbids them from refusing to offer preexisting policies to potential customers based on disability, or whether, as Plaintiff contends, it requires insurers to modify their policies to cover the disabilities of potential customers. *See Leonard F.*, 967 F.Supp. at 805–06 (reasoning that insurers need not modify their

## Conclusion

The judgment of the district court is VACATED, and the case REMANDED to the district court for further proceedings consistent with this opinion.

policies so long as the policies comply with state law and do not constitute a "subterfuge to evade the purposes of [the Act]"). In *Mutual of Omaha*, 179 F.3d at 559–60, 562–64, a case similar to this one, the Seventh Circuit reasoned that while the ADA probably prohibits an insurer from categorically refusing to insure a disabled individual, the Act does not obligate insurers to devise policies to cover all disabilities.

Because we, like the district court, rely on the safe harbor provision of Section 501(c) to dispose of Plaintiff's claim, we express no views on these and various other questions.