CRAWFORD & SONS, LTD. PROFIT SHARING PLAN, James A. Crawford Profit Sharing Plan, East Prospect State Bank, Equitable Bank, First National Bank (Scott City), First Security State Bank, Northwest Bank, People's Bank, Sand Ridge Bank, Bluestem National Bank, First Victoria National Bank, American Savings, FSB, Mutual Federal Savings Bank, First National Bank (Smith Center), The Dime Savings Bank, Third Federal Savings Bank, Fidelity Bank of Florida, Citizens National Bank, City National Bank, Plaintiffs,

v.

Rochelle BESSER, Wallace I. Besser, Barry Drayer, RW Professional Leasing Services, Inc., Defendants.

No. 02 CV 3442(ADS)(ETB).

United States District Court, E.D. New York.

July 11, 2003.

Margolin & Pierce, LLP, By Errol F. Margolin, of Counsel, New York City, for Plaintiffs.

Dunnington, Bartholow & Miller, LLP, By Thomas V. Marino, of Counsel, New York City, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Presently before the Court is a motion to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

## I. BACKGROUND

The following facts are taken from the amended complaint filed by Crawford & Sons, Ltd. Profit Sharing Plan ("Crawford"), James A. Crawford Profit Sharing Plan, East Prospect State Bank, Equitable Bank, First National Bank (Scott City), First Security State Bank, Northwest Bank ("Northwest"), People's Bank ("People's"), Sand Ridge Bank ("Sand Ridge"), Bluestem National Bank ("Bluestem"), First Victoria National Bank ("First Victoria"), FSB, Mutual Federal Savings Bank ("Mutual"), First National Bank (Smith Center), The Dime Savings Bank ("Dime"), Third Federal Savings Bank ("Third Federal"), Fidelity Bank of Florida ("Fidelity"), Citizens National Bank, City National Bank (collectively the "plaintiffs") against Rochelle Besser, Wallace I. Besser, Barry Drayer ("Drayer"), RW Professional Leasing Services, Inc. ("RW Professional") (collectively, the "defendants").

The amended complaint alleges that RW Professional is in the business of longterm leasing of medical, dental, and veterinary equipment to doctors, dentists, veterinarians and other medical providers throughout the country. To finance its business, RW Professional assigned its leases to various institutional lenders, including the plaintiffs. RW Professional secured loans from the plaintiffs pursuant to a series of agreements for each leasing transaction customarily signed on behalf of RW Professional by Rochelle Besser, one of the two shareholders of RW Leasing and its president-treasure.

To induce the plaintiffs to loan them money, the defendants represented, warranted, and agreed by mail and wire communication that: (1) the assigned leases had been executed by the lessee and were valid, binding, and enforceable according to their terms; (2) the assigned leases were in full force and effect; (3) the leased equipment had been delivered to the lessees; (4) the lessees were not in default under the leases; (5) RW Leasing would remit all payments from its leases to the plaintiffs until its borrowings were repaid; (6) RW Leasing would segregate and cause such lease payments to be deposited in a secure escrow account, for the benefit of and transmission to the plaintiffs; (7) if any of its lessees prepaid its lease, such prepayment would be transmitted to the plaintiffs within three days of receipt; (8) if any financed leases were in default, RW Professional would substitute new leases of equal or greater value; (9) RW Leasing owned the leased equipment and the assigned leases were subject only to the rights of the lessees; (10) RW Professional had not assigned, transferred, or otherwise encumbered the assigned interests; and (11) RW Leasing had not conveyed any security interest in the leases. The plaintiffs append to the amended complaint samples of the forms the defendants used to effectuate these transactions.

For each lease financing transaction, RW Leasing executed (1) a promissory note in

favor of the plaintiff involved; (2) a security agreement and assignment of lease in favor of such plaintiff; and (3) a service agreement in favor of such plaintiff. The plaintiffs claim that in most instances, RW Leasing also executed an escrow agreement with the Bank of New York as escrowee, requiring that all monies received from the plaintiff be deposited with the Bank of New York to be applied to payment of the respective loan obligation.

Nevertheless, the plaintiffs allege that the defendants (1) failed to remit payments received by them from lessees to the plaintiffs; (2) diverted and commingled such lease payments with RW Leasing's general operating account rather than have them escrowed for transmission to the plaintiffs; (3) failed to notify the plaintiffs of the lessees' prepayment of certain leases and failed to remit all remaining principal due therein within three days; (4) failed to notify the plaintiff's of leases in default or to replace them with new leases of equal or greater value; (5) failed to deposit or cause the deposit of lease payments received from the lessees with the Bank of New York as escrowee; (6) entered into lease financing transactions with the plaintiffs in which there was no actual underlying lease with a medical provider lessee; and (7) financed the same lease with more than one lender.

To conceal the alleged fraud, the plaintiffs claim that the defendants created fake checks supposedly written by a lessee in payment of his or her lease obligations and then sent photocopies of the fake checks to the lender. The plaintiffs further claim that the defendants altered RW Leasing's records to make them coincide with the fake checks rather than the actual payments. In addition, the amended complaint states that the defendants created records in the name of Riteway Health Services, Inc. ("Riteway"), a non-existent company supposedly in the medical equipment supply business that purportedly supplied the equipment for non-existent leases presented to the plaintiff to obtain funding.

Furthermore, the defendants rented a number of mailboxes throughout the country supposedly in the name of RW Leasing's lessees so that RW Leasing could conceal its conversion of lease payments, the lessees' defaults, the non-existence of the underlying lease transactions, and the financing of the same lease with more than one lender.

On or about June 20, 2002, the United States Attorney for the Eastern District of New York initiated criminal proceedings in this Court for alleged bank fraud against Rochelle Besser, Drayer, and others affiliated with RW Professional. The amended complaint appends the criminal complaint and affidavit in support of arrest, and seizure warrants signed and verified by Rondie Peiscop–Grau, a special agent with the Federal Bureau of Investigation. The affidavit specifies fraudulent practices and transactions by the defendants uncovered as a result of a criminal investigation.

In particular, the affidavit states that the defendants rented mailboxes from Mail Boxes, Etc. throughout the country in states, including California, Arizona, Colorado, New York, and Ohio. The affidavit also indicates that the applications for some of these mailboxes were signed by Drayer, RW Leasing's secretary and vice-president, and that the mail was to be received in the name of "Roger Drayer." The affidavit states that files show RW Leasing sent checks to Mail Boxes Etc. signed by Rochelle Besser. The affidavit asserts that each mailbox was paid for by Drayer or Rochelle Besser.

In addition, the affidavit states that these mailboxes from Mail Boxes, Etc. appear to be connected to former customers of RW Leasing and that the addresses for these mailboxes were the billing addresses for many of RW Leasing's purported medical provider customers. The affidavit describes that RW Leasing's files include invoices addressed to these mailboxes and fake checks signed by these medical providers bearing these addresses. The affidavit also states that false documents were generated to enable RW Leasing to conceal the fact it had converted funds from loans that had been prepaid; loan proceeds that were never dispersed to a customer; and deals that had been funded by multiple lenders. The affidavit indicates that there are letters from Rochelle Besser from 1998 and 1999 falsely

stating that a certain lease was prepaid in full.

Based on the allegations in the amended complaint and from the documents appended to it, the plaintiffs claim that the defendants committed common law fraud and mail fraud in violation of 18 U.S.C. § 1343, wire fraud in violation of 18 U.S.C. § 1341, and bank fraud in violation of 18 U.S.C. § 1344 and allege RICO claims pursuant to 18 U.S.C. §§ 1962(a) through (d). The amended complaint details a series of transactions that allegedly were a part of the defendants' fraud.

### A. Crawford

On or about October 22, 2001, Crawford was assigned an equipment lease to a physician by the name of Macauley A. Ojeaga, for which Crawford loaned the sum of $394,030.68 to RW Professional. Crawford wire transferred this sum to RW Professional in or around February 2002. Ojeaga refinanced his loan with a local Texas bank, repaid his lease and received a satisfaction from RW Professional. However, RW Professional failed to inform Crawford of this transaction and failed to remit any of the proceeds to Crawford.

### B. Northwest Bank

On or about May 8, 2001, RW Professional assigned a number of leases to Northwest, including an equipment lease to a physician by the name of Kodihalle Prosannakuma. Based on this lease, Northwest loaned the sum of $69,699.31 to RW Professional, which loan was never repaid. The plaintiffs claim that Prosannakum has submitted affidavits to Northwest establishing that he never entered into the purported transaction with RW Professional and that his signature was forged on the transaction documents. On or about May 3, 2002, a law firm representing RW Professional sent Northwest its client's documents with regard to this transaction, including papers containing Prosannakuma's allegedly forged signature.

Another lease assigned to Northwest was for new equipment to a dentist by the name of Raymond G. Nikodem. With regard to this lease, Northwest loaned the sum of $34,475.28 to RW Professional. In support of the loan, RW Professional provided an invoice from Riteway for new equipment supposedly leased to Nikodem. However, Nikodem informed Northwest that, after signing a few documents, he had changed his mind. Nikodem also informed Northwest that he believed his loan was unsecured and that he never received the new dental equipment.

### C. People's Bank

On or about December 29, 1999, RW leasing assigned to People's two equipment leases, including equipment purchased from Riteway to two medical corporations named Karyn L. Grossman, M.D., Inc. and Steven A. Teitelbaum, M.D. as co-lessees, for which transaction People's loaned the sum of $290,779.20 to RW Professional. The principals of the two medical corporations informed People's that their lease was actually refinanced by another lender. RW Professional did not inform People's of this transaction and did not remit any of the proceeds to People's.

People's was also assigned two equipment leases to Dr. Sul's Family & Sports Medicine Associates, P.A. ("Dr. Sul's") and Sixth Avenue Family Practice, P.C. ("Sixth Avenue"), for which People's loaned the sum of $352,062.25 to RW Professional. Dr. Sul informed People's that it had repaid the lease to RW Professional by a check dated June 1, 2001, a copy of which was furnished to People's. In addition, Sixth Avenue informed People's that it had also repaid the lease. RW Professional did not inform People's of these transactions and did not remit any of the proceeds to People's.

### D. First Victoria and Fidelity Banks

On or about January 28, 1999, First Victoria was assigned an equipment lease to a professional corporation named Donald F. Alemeida & Associates, D.D.S., P.C., for which First Victoria loaned the sum of $116,000 to RW Professional. However, on January 29, 1999, one day later, RW Professional assigned the same lease to Fidelity. In return, Fidelity loaned RW Professional the sum of $249,990.58. On an unspecified

date, Dr. Almeida informed both First Victoria and Fidelity that his lease was paid, as confirmed by a letter from RW Professional dated November 8, 2001. Dr. Almeida also informed them that he had received letters from a bank in Philadelphia, Pennsylvania stating that it had been assigned the same lease by RW Professional. Again, RW Professional did not inform First Victoria or Fidelity of these transactions and did not remit any of the proceeds to either of them.

### E. Sand Ridge Bank

On or about May 30, 1998, RW Leasing assigned to Sand Ridge an equipment lease to a dentist by the name of Dr. Thomas v. Hausen, for which transaction Sand Ridge loaned the sum of $87,382.71 to RW Professional. Dr. Hausen informed Sand Ridge that on or about October 18, 1999 he repaid off his equipment lease, as confirmed by a letter from RW Professional dated February 14, 2000. RW Leasing did not inform Sand Ridge of this transaction and did not remit any of the proceeds to Sand Ridge.

### F. Bluestem National Bank

On or about June 28, 2000, RW Leasing assigned to Bluestem an equipment lease to a physician by the name of Dr. Jeffrey A. Quitman, for which transaction Bluestem loaned the sum of $57,004.62 to RW Leasing. On or about June 12, 2000, Dr. Quitman was involved in an automobile accident and was in a coma until approximately June 30, 2000, and he was left permanently disabled. While Dr. Quitman was in a coma, RW Leasing assigned the lease to Bluestem. Dr. Quitman never received the equipment. RW Leasing never repaid its loan and never explained what happened to the equipment involved.

In addition, on or about June 28, 2000, RW Leasing assigned to Bluestem an equipment lease to Broadmoor Veterinary Clinic, Inc. ("Broadmoor"), for which transaction Bluestem loaned the sum of $93,206.60 to RW Leasing. On or about August 29, 2000, RW Leasing also assigned Broadmoor's lease also to First Victoria National Bank. Based on this transaction, First Victoria loaned RW Leasing the sum of $157,000. Broadmoor's

principal, Dr. Eugene Clothier, reported that he had filed for bankruptcy in 2001 and that five lenders, including Bluestem and First Victoria, had each claimed an assignment on the leases and equipment now being financed by American Express. RW Professional never informed either Bluestem or First Victoria of these transactions and did not remit proceeds to either of them.

### G. Mutual Federal Savings Bank

On or about February 1, 2002, RW Leasing assigned to Mutual two equipment leases to two professional associations, Michael Mohan, MD, PA and Floralba Vuelta, P.A., for which transactions Mutual loaned the sums of $103,632.13 and $68,487.00, respectively, to RW Professional. In a letter to Mutual dated April 12, 2002, RW Professional informed Mutual that the transactions with the two professional associations were never funded. Nevertheless, RW Professional retained the loan proceeds.

### H. Dime Savings Bank

On or about May 12, 2000, RW Professional assigned to Dime two equipment leases to a limited liability company, Physicians Advanced Health Care Group, LLC. ("Physicians"), for which transaction Dime loaned the sum of $1,104,672.02 to RW Professional. On or about June 6, 2002, on behalf of RW Leasing, Drayer informed Dime that the equipment was either never purchased after Physicians cancelled the order or was refinanced by another bank. Until that time, RW Leasing never informed Dime of these events and never remitted any of the proceeds to Dime.

### I. Third Federal Savings Bank

On or about April 8, 2002, RW Professional provided a report to Third Federal which stated that the amount of $3,700,272 was due on leases assigned to Third Federal. However, prior to that date, on or about February 28, 2002, RW Professional provided a report which stated that an amount of $4,295,339 was due on such leases. Although the defendants claimed that the decrease on the balance due reflected payments from les-

sees, Third Federal received no payments after February 28, 2002.

## II. DISCUSSION

### A. Standards

#### 1. Federal Question

The plaintiffs claim that the Court has subject matter jurisdiction over their federal claims pursuant to 18 U.S.C. § 1962 *et seq.* ("RICO"). The defendants move to dismiss the RICO claims pursuant to Rules 12(b)(1) and 12(b)(6), arguing that the complaint fails to provide a basis for the Court's exercise of federal subject matter jurisdiction because it fails to state a RICO claim. "Whether a federal court possesses federal-question subject matter jurisdiction and whether a plaintiff can state a claim for relief under a federal statute are two questions that are easily, and often, confused." *Carlson v. Principal Financial Group,* 320 F.3d 301, 305–06 (2d Cir.2003) (citing *Montana–Dakota Utilities Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912 (1951)). If the basis for subject matter jurisdiction is also an element of the plaintiff's asserted federal cause of action, "[the court will] ask only whether—on its face—the complaint is drawn so as to seek recovery under federal law. If so, then we assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits." *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir.1996). Here, on its face, the amended complaint seeks relief under RICO, and the defendants attack the sufficiency of the plaintiffs' RICO claims. As such, the Court will assume subject matter jurisdiction and evaluate the merits of the plaintiffs' RICO claims under Rule 12(b)(6).

#### 2. Standard for Rule 12(b)(6)

On a motion to dismiss for failure to state a claim, the Court should dismiss the complaint pursuant to Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle him to relief. *See King v. Simpson,* 189 F.3d 284, 286 (2d Cir.1999); *Bernheim v. Litt,* 79 F.3d 318, 321

(2d Cir.1996). The Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999). Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Koppel v. 4987 Corp.,* 167 F.3d 125, 127 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997).

The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *See Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). Indeed, it is not the Court's function to weigh the evidence that might be presented at trial; instead, the Court must merely determine whether the complaint itself is legally sufficient. *Id.*

### B. The RICO Claims

"Section 1962 prohibits: (a) the use of income 'derived … from a pattern of racketeering activity' to acquire an interest in, establish, or operate an enterprise engaged in or whose activities affect interstate commerce; (b) the acquisition of any interest in or control of such an enterprise 'through a pattern of racketeering activity'; (c) the conduct or participation in the conduct of such an enterprise's affairs 'through a pattern of racketeering activity'; and (d) conspiring to do any of the above." *Allen v. New World Coffee,* No. 00 Civ. 2610, 2001 WL 293683, at *5, 2001 U.S. Dist. LEXIS 3269, at *15 (S.D.N.Y. Mar. 26, 2001) (quoting 18 U.S.C. § 1962).

In order to bring a RICO claim, a plaintiff must allege (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly to conduct or participate in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)-(c); *De Falco v. Bernas,* 244 F.3d 286, 306 (2d

Cir.2001); *USA Certified Merchants, LLC. v. Koebel*, 262 F.Supp.2d 319, 331 (S.D.N.Y. 2003). "Racketeering activity" is defined as comprising specific enumerated crimes, including mail fraud, wire fraud, and bank fraud as alleged in this case. 18 U.S.C. § 1961. Under RICO, a "pattern of racketeering activity" consists of "at least two predicate acts of racketeering activity." *Id.*

The plaintiffs assert that the defendants are liable for violations of 18 U.S.C. §§ 1962(a), (b), (c), and (d). The defendants contend that all four claims must be dismissed because of the plaintiffs failure to allege the predicate acts of mail, wire, and bank fraud with particularity under Fed. R.Civ.P. 9(b). Alternatively, the defendants argue, among other things, that (1) the claim for Section 1962(a) should be dismissed because the plaintiffs have failed to allege injury as a result of the investment of racketeering income; (2) the claim for Section 1962(b) should be dismissed because the plaintiffs have failed to allege any injury which resulted from the acquisition and maintenance of any interest or control in an enterprise distinct from the injury allegedly suffered from the predicate acts; (3) the claim for Section 1962(c) should be dismissed because the plaintiffs have failed to allege a RICO enterprise separate and distinct from the persons comprising the enterprise; and (4) the claim for Section 1962(d) should be dismissed because the plaintiffs have failed to allege any cause of action for a RICO a conspiracy.

### 1. Predicate Acts

#### a. *Mail and Wire Fraud*

18 U.S.C. §§ 1341 and 1343 prohibits the use of mail or wire communications for the purposes of executing a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." To allege mail or wire fraud, a plaintiff must plead that the defendants engaged in "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir.2000). Allegations of mail or wire fraud are subject to the particularity requirements of Rule 9(b). *See D.R.S. Trading Co., Inc. v. Fisher*, No. 01

Civ. 8028, 2002 WL 1482764, at *4, 2002 U.S. Dist. LEXIS 12403, at *10 (S.D.N.Y. July 9, 2002).

Pleading mail or wire fraud with the requisite particularity under Rule 9(b) requires the plaintiffs to (i) specify the statements that they contend were false or misleading; (ii) explain why the statements were fraudulent; (iii) state when and where the statements were made; and (iv) identify the speaker or speakers. *Moore v. Paine-Webber, Inc.*, 189 F.3d 165, 173 (2d Cir.1999). Allegations of intent are subject to a less strict standard. *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1128 (2d Cir.1994). Nevertheless, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *Id.* In addition, where more than one defendant is accused of fraud, a plaintiff must plead fraud with particularity as to each of the defendants. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993); *Di Vittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) ("where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendants of the nature of his alleged participation in the fraud.").

Applying these standards to the instant case, the Court concludes that the plaintiffs' claims are sufficient to satisfy the particularity requirements of Rule 9(b). The amended complaint identifies multiple acts of mail and wire fraud. The amended complaint alleges that to secure loans from the plaintiffs and other institutional lenders, the defendants represented by both mail and wire communication, among other things, that the leased equipment had been delivered to the lessees; that the lessees were not in default under the leases; that RW Leasing would remit all payments from its leases to the plaintiffs until its borrowings were repaid; that if any of its lessees prepaid its lease, such prepayment would be transmitted to the plaintiffs within three days of receipt; that if any financed leases were in default, RW Professional would substitute new leases of equal or greater value; that RW Professional had not assigned, transferred, or oth-

erwise encumbered the assigned interests. Despite the representations made by the defendants, the amended complaint identifies a number of instances in which the defendants allegedly obtained loan proceeds from banks for non-existent leases; pledged the same leases to multiple financial institutions; and converted loan prepayments to their own use.

The amended complaint describes that Rochelle Besser customarily signed the lease agreements. Appended to the amended complaint are several dated documents with Rochelle Besser's signature from the various transactions described in the amended complaint. The amended complaint also identifies the dates in which the plaintiffs entered into the transactions with the defendants. In addition, the criminal complaint and affidavit in support of arrest, and seizure warrants signed and verified by an FBI agent states that Rochelle Besser signed several letters from 1998 and 1999 falsely stating that a certain lease was prepaid in full. *See Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.*, 155 F.3d 59, 67 (2d Cir.1998) (stating that on a motion to dismiss the court may consider "facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint . . .").

To conceal the alleged fraud, the amended complaint describes that the defendants rented a number of mailboxes from Mail Boxes, Etc. throughout the country. A review of the affidavit by the FBI agent reveals that Drayer and others rented mailboxes in several states and that these mailboxes were paid for by either Drayer or Rochelle Besser. The affidavit further describes that the applications for the mailboxes indicated that mail was to be received in the name of "Roger Drayer" and others. In addition, the affidavit states that a file contained a check from RW Leasing to Mail Boxes, Etc. and that several faxes from Mail Boxes, Etc. were sent to RW Leasing. Furthermore, it details how these mailbox addresses were used as the billing addresses for a number of its purported medical provider customers and that RW Leasing's files include invoices addressed to these mailboxes and fake checks purportedly signed by these medical provid-

ers bore these addresses. Both the amended complaint and the affidavit reveal that RW Leasing generated fake checks and forwarded these to certain lenders to convince the lenders that various accounts were not delinquent.

Thus, a review of the amended complaint, coupled with the appended affidavit and various documents show that the plaintiffs have more than adequately pled the existence of mail and wire fraud. However, with respect to Wallace Besser, the amended complaint, as well as the exhibits appended to it, are completely silent as to Wallace Besser's role in the alleged fraud. As such, the defendants' motion to dismiss the plaintiffs' RICO claims based on the predicate acts of mail and wire fraud is denied as to RW Leasing, Rochelle Besser, and Drayer, but granted as to Wallace Besser.

### b. Bank Fraud

The plaintiffs also allege bank fraud as a predicate act under RICO. Bank fraud is defined in 18 U.S.C. § 1344 as "engaging in or attempting to engage in a scheme to defraud a financial institution or to obtain money, funds, credits, assets, securities, or any other property owned by a financial institution through false or fraudulent pretenses.'" *Ifill v. West*, No. 96 Civ. 6308, 1999 WL 690144, at *5, 1999 U.S. Dist. LEXIS 21320, at *17 (E.D.N.Y. Aug. 24, 1999) (quoting *Bank of Vermont v. Lyndonville Sav. Bank & Trust Co.*, 906 F.Supp. 221, 227 (D.Vt. 1995)).

For the reasons stated above with respect to the allegations of mail and wire fraud, the Court finds that the amended complaint also alleges bank fraud with particularity as required by Rule 9(b). The amended complaint states that RW Leasing secured medical equipment for medical providers by obtaining loans from the plaintiffs and other institutional investors and that RW Leasing used the loan proceeds to purchase the equipment which would be leased to the medical provider and collect the lease payments which would be used to repay the plaintiffs. However, as previously described, despite various representations made by the defendants, the amended com-

plaint specifies a number of instances where RW Leasing obtained loan proceeds from banks for non-existent leases; pledged the same leases to multiple financial institutions without their knowledge; retained loan proceeds on leases that RW Leasing never funded; and failed to report delinquent accounts. The amended complaint further alleges that the defendants forged lessees' signatures, created documents with the name of a non-existent medical supply company, and forwarded fake checks to the plaintiffs to convince the lenders that various accounts were not delinquent.

In addition, the amended complaint states that Rochelle Besser generally signed the agreements and that Drayer rented mailboxes throughout the country to conceal their alleged scheme. Based on the detailed allegations in the amended complaint and the documents appended to it, the Court finds that the plaintiffs have sufficiently pled bank fraud. However, because the amended complaint fails to specify Wallace Besser's involvement in the alleged scheme, the motion to dismiss the RICO claims based on the predicate act of bank fraud is granted as to Wallace Besser but denied as to RW Leasing, Rochelle Besser, and Drayer. Thus, the claims against Wallace Besser are dismissed.

Accordingly, the Court finds that the plaintiffs sufficiently allege two predicate acts and that they therefore allege a "pattern of racketeering activity." The Court will now examine whether the plaintiffs have sufficiently alleged the elements of each RICO claim.

### 2. Section 1962(a)

Section 1962(a) requires a plaintiff to allege that, (1) the defendant used or invested racketeering income to acquire or maintain an interest in the alleged enterprise; and (2) the plaintiff suffered an injury as result of that use or investment. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 82 (2d Cir.1990). "Allegations that the money was used to perpetuate the enterprise are insufficient." *Goldberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 97 Civ. 8779, 1998 WL 321446, at *3, 1998 U.S. Dist. LEXIS 8906, at *9 (S.D.N.Y. June 16, 1998). In addition, the plaintiff must allege a "use or investment

injury" distinct from any injury resulting from the alleged predicate acts. *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir.1996).

■ Here, aside from conclusory allegations, the amended complaint fails to allege how the defendants used the income derived from the loans "to acquire or maintain an interest in the alleged enterprise." The amended complaint is also deficient in this regard because it does not allege how the investment of income derived from the alleged acts of racketeering resulted in injury to the plaintiffs. Thus, the plaintiffs' Section 1962(a) claim is dismissed.

### 3. Sections 1962(b)

Section 1962(b) makes it unlawful for "any person through a pattern of racketeering ... to acquire or maintain ... any interest in or control of any enterprise...." Under Section 1962(b), a plaintiff must allege an injury arising from an acquisition or maintenance of any interest in or control of an enterprise. *Discon, Inc.*, 93 F.3d at 1063. Thus, like Section 1962(a), Section 1962(b) requires an injury that is distinct from the alleged racketeering activity. *Lippe v. Bairnco Corp.*, 225 B.R. 846, 860 (S.D.N.Y.1998). Here, no such injury is alleged. Thus, the Section 1962(b) claim is dismissed.

### 4. Section 1962(c)

Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Prior to the recent Supreme Court case, *Cedric Kushner Promotions, Ltd. v. Don King*, 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001), the Second Circuit required a plaintiff to establish the existence of two separate entities, a "person" and a distinct "enterprise," the affairs of which that "person" improperly conducts. *See, e.g., Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir.1994).

In *Cedric*, the Supreme Court held that a corporate employee acting even within the scope of his authority for a corporation was distinct from the corporation and could therefore be subject to RICO liability. *Id.* at 163, 121 S.Ct. 2087. The Supreme Court explained that "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its legal status ... [a]nd we find nothing in the [RICO] statute that requires more separateness than that." *Id.* Furthermore, the Supreme Court instructed that "[a] corporate employee who conducts the corporation's affairs through an unlawful RICO 'pattern of activity' uses that corporation as a vehicle whether he is or is not the sole owner." *Id.* at 164–65, 121 S.Ct. 2087.

■ Here, viewing the complaint in the light most favorable to the plaintiffs, the Court finds that Rochelle Besser, one of the two shareholders of RW Leasing and its president, and Drayer, the secretary and vice-president, are separate and distinct from the legal entity RW Leasing. Therefore, the amended complaint adequately establishes the distinctness requirement. Accordingly, the motion to dismiss the plaintiffs' Section 1962(c) claim is denied.

### 5. Section 1962(d)

Section 1962(d) provides liability for RICO conspiracies. Because the plaintiffs have sufficiently alleged a claim for Section 1962(c), the allegations in the amended complaint sufficiently set forth a conspiracy to commit such a violation under Section 1962(d).

### III. CONCLUSION

Based on the foregoing it is hereby

ORDERED, that the motion to dismiss the claims for Section 1962(a) and 1962(b) is GRANTED; and it is further

ORDERED, that the motion to dismiss the claims for Section 1962(c) and 1962(d) is DENIED; and it is further

ORDERED, that the Clerk of the Court is directed to amend the caption as follows:

**SO ORDERED.**